THE PEOPLE OF THE STATE OF NEW YORK, Appellants and Respondents, *v.* THE BANK OF NORTH AMERICA, Appellant and Respondent.

The State has such a title or interest in a draft indorsed to the State treasurer and delivered into his office by a county treasurer for the payment of taxes due the State, that an action may be maintained in the name of the People for a conversion thereof.

P., a clerk in the office of the State treasurer, without authority, indorsed a number of such drafts and negotiated them. Defendant took them from the indorsees, collected the money from and surrendered them to the drawees. *Held,* that defendant was liable to the State for a conversion of the drafts; that it could not claim an exemption on the ground it took them in good faith, solely as agent, in the course of a public employment.

*It seems,* that the State treasurer may delegate the power to indorse such drafts to a clerk in his office; it is not an act involving the exercise of judgment or discretion, and it is not one of the official duties prescribed by statute which must be performed by the treasurer in person.

P was styled "cashier" in the treasurer's office; his general duties were to keep the treasurer's ledger and cash book and the bank pass books, to make bank deposits, and to make certain petty cash disbursements; it was no part of his duty to indorse drafts, he was expressly prohibited from doing so, and upon several occasions when he assumed to do it the treasurer, when it came to his knowledge, forbade it. *Held,* that the evidence authorized a finding that P had no authority express or implied to indorse.

Also, *held,* that even if on one or two occasions when P. indorsed, the treasurer, when advised of it, did not express to him his disapproval, this was not material upon the question of actual authority.

At one time, the treasurer, when absent from his office, sent two drafts payable to his order as treasurer to P. with directions to deposit; the clerk indorsed the name of the treasurer and deposited them. *Held,* that this did not show authority to indorse drafts generally.

Upon another occasion, when P. had indorsed a draft, the holder not satisfied with the indorsement sent it to the treasurer, who indorsed it him-

self. *Held*, that this was not evidence that the treasurer sanctioned or ratified the indorsement by P.; but on the contrary that he recognized its invalidity.

It appeared that P. indorsed in all fifteen drafts aside from those in question; defendant did not know of any of these indorsements, or of any of the facts existing, which induced or could induce it to suppose that P. had authority; it simply acted upon his indorsement upon the drafts taken by it. *Held*, that the State was not estopped from denying the authority of P. to indorse, as defendant was not induced to act by any apparent authority.

Apparent authority operates only by way of estoppel, and takes the place of real authority only where some person has acted upon the appearances.

A person is not, as a general rule, estopped from showing title to property simply because he has not exercised ordinary care to prevent an unauthorized transfer thereof by another.

It is only where, by negligence, he has permitted such other person to clothe himself, or to be clothed, with apparent authority to act for him, and thereby a third person has been induced to rely and act upon the appearance that the owner is estopped.

Accordingly *held*, that the State was not estopped by a finding that the treasurer might, by ordinary care, have discovered and prevented the fraudulent acts of P. in indorsing and diverting the drafts.

As to whether an estoppel, by negligence or otherwise can be invoked as against the State, *quære*.

The drafts, after payment by the drawees, were returned to the drawers, and, thereafter, were returned to the State treasurer, at his request, to enable him to ascertain the extent of the defalcation of P., and as evidence, not with any intent on the part of the treasurer to use or enforce them as existing obligations, except by bringing actions against parties who had converted them. *Held*, that the fact that they came again into the possession of the treasurer did not under the circumstances go in mitigation of damages; also that it was immaterial that before the commencement of the action plaintiffs demanded the drafts of defendant, it having refused to deliver.

The defendant, in an action for the conversion of property, can only claim a mitigation of damages, because of a return of the property, where the owner has accepted its return or has resumed dominion over it as owner.

Two drafts which came into the treasurer's office in the same manner as the other, were indorsed in blank by the deputy treasurer, who had authority, and were delivered to P. for deposit in one of the legally designated deposit banks. P. filled up the blanks in the indorsements with the name of the cashier of a firm of private bankers and delivered them to that firm, defendant took and collected them. *Held*, that defendant was not liable for conversion of them; that the drafts were not received and were not to be regarded as money in the hands of the treasurer, and he was not bound to place them in the deposit banks, but could collect them in any manner he chose; and that, therefore, the fact

that they were in the hands of private bankers was not such notice to defendant that they had been wrongfully diverted as to charge it with bad faith in dealing with them.

(Argued December 21, 1878; decided January 21, 1879.)

THESE were cross-appeals from judgment of the General Term of the Supreme Court, in the first judicial department, affirming a judgment in favor of plaintiffs, entered upon the report of a referee.

The nature of the action and the facts appear sufficiently in the opinion.

*Francis C. Barlow,* for plaintiffs. If defendant collected or in any way exercised dominion over the drafts it is liable either in trover for their conversion or for the money received upon them. (*Talbot* v. *Bank of Rochester*, 1 Hill, 295; *Graves* v. *American Ex. Bank*, 17 N. Y., 205; *White* v. *Sweeney*, 4 Daly, 223; *Bayce* v. *Brockway*, 31 N. Y., 490; *Hoffman* v. *Carrow*, 22 Wend., 287–318–319; *Matthews* v. *Menedeger*, 2 McLean R., 145.) The drafts were legally receivable by the treasurer for taxes. (1 R. S. [6th ed.], 534, § 1; 1 R. S. [6th ed.], 957, §§ 46–47; § 2, act chap. 427, Laws of 1855; 7 Wallace, 666; *Millenberger* v. *Cooke*, 18 id., 421; *Decker* v. *Judson*, 16 N. Y., 442; *People* v. *McComber*, 18 id., 315–325; *People* v. *Sherwin*, 2 N. Y. Sup. Ct. [Thom. & Cook], 528; 1 R. S. [6th ed.], 528, subd. 6, 530, § 19.) The treasurer could not give or delegate to any one the power to indorse the paper of the State. (1 R. S. [6th ed.], 536, § 22; *Chapman* v. *Inhabitants*, 56 Me. R., 390; *Com. Bank* v. *Norton*, 1 Hill, 501; *Lewis* v. *Ingersoll*, 1 Keyes, 347–356; *Newton* v. *Bronson*, 13 N. Y., 594; *U. S.* v. *The Commissioner*, 5 Wall., 563; *U. S.* v. *Seaman*, 17 How. [U. S.], 225; *State* v. *Hastings*, 10 Wis. R., 533.) There was no negligence on the part of the treasurer which would estop him from denying, as against defendant, that Phelps had authority to indorse drafts. (*Weiser* v. *Denison*, 10 N. Y., 68; 10 id., 83; *Man. Nat. Bk.* v. *Barnes*, 65 N. Y. [Ill.] R., 69.) There was no "acquies-

cence with knowledge" on the part of the treasurer which is necessary to constitute an authority by estoppel. (34 N. Y., 53; *Reynolds* v. *Lounsbury*, 6 Hill, 534; *Calkin* v. *Grote*, 4 E. D., 304; *Pickard* v. *Sears*, 6 Adol. & E., 475; *Freeman* v. *Cooke*, 2 Exch. R., 654; *Cairncross* v. *Lorimer*, 3 Macq. H. L. Cases, 829; *Swan* v. *N. B. A. Co.*, 7 H. & N., 603; *Halifax* v. *Wheelhouse*, L. R., 10 Exch., 192; *Morris* v. *Bethel*, L. R., 5 C. P., 47.) The treasurer could only be estopped from denying Phelps' authority to indorse for deposit in the Albany banks designated for that purpose. (Floyd Acceptances, 7 Wall., 677.) There is no estoppel against the State. (*Pierce* v. *U. S.*, 1 Ct. of Claims R., 270; *State* v. *Hastings*, 10 Wis., 526; *Supervisors* v. *Ellis*, 59 N. Y., 625; *Johnson* v. *U. S.*, 5 Mason, 425–440; 7 Cranch Sup. Ct. R., 366; *Curtiss* v. *U. S.*, 2 Ct. Claims R., 144; *Hunter* v. *U. S.*, 5 Pet., 173–187; 67 Ill. R., 465; *U. S.* v. *Van Zandt*, 11 Wheat., 184; *U. S.* v. *Kirkpatrick*, 9 id., 720–735; *Jansen* v. *The People*, 7 J. R., 332; *People* v. *Russell*, 4 Wend., 574; 14 id., 171; *Seymour* v. *Van Slyck*, 8 id., 422.) Neither the treasurer nor his deputy had power to indorse generally, but were restricted to such indorsements as were authorized by law. (1 R. S. [6th ed.], 534, § 17; id., 575, § 50; *People* v. *McComber*, 18 N. Y., 315–318–325; *The Carlotta*, 1 Dodson's Report, 392; 1 Story's Eq. Juris., § 111; Dr. & Student Dialogue, 2 chap., 46; *Huntley* v. *Beecher*, 30 Barb., 586; Bishop's Crim. Law, vol. 1, § 375; Story's Eq. Jur., § 116; 53 Ill. R., 458; 6 Clark & Finnelly, 966.) Defendant had ample ground to put it on inquiry, and to charge it through its negligence with a knowledge of the diversion of the drafts. (*Shaw* v. *Spencer*, 100 Mass., 382.) The fact that plaintiffs had possession of the drafts at the time of the trial and before does not go in mitigation of damages. (*Hanmer* v. *Wilsey*, 17 Wend., 93, 94; *Otis* v. *Jones*, 21 id., 397; *Gordon* v. *Harper*, 7 T. R., 9–13; 2 Selw. Nisi Prius [7th Am. ed.], 1857; *Pintard* v. *Tackington*, 10 J. R., 104; *Graves* v. *Am. Ex. Bank*, 17 N. Y., 205; *Connaughty* v. *Nichols*, 42 id., 83.)

*Elihu Root*, for defendant. Upon the facts found the indorsements by Phelps were duly authorized by the treasurer. (*Myers* v. *Machado*, 6 Abb. Pr., 198, 201, 203.) The apparent authority shown was an authority apparent to defendant, and would be conclusive, even if actual authority was not shown. (1 R. S. [m. p.], 171, § 8; id., 178, § 13; *Bk. of Ky.* v. *Schuylkill Bk.*, 1 Pars. Eq. Cas., 180; 1 Parsons on Notes & Bills, 100; *Valentine* v. *Parker*, 5 Penn. St., 333; Story on Agency, §§ 114–115; *Prescott* v. *Flynn*, 9 Bing., 19; *Frudrdy* v. *Farrar*, 32 Me., 225; *Dows* v. *Green*, 16 Barb., 72; Smith's Mercantile Law, 170, chap. 5, § 4; *Young* v. *Grote*, 4 Bing., 253; *Swan* v. *N. British Australasian Co.*, 7 H. & N., 603; *Barber* v. *Gingle*, 3 Esp., 60; *Delafield* v. *State of Ill.*, 26 Wend., 192–226; *Morrison* v. *Buchanan*, 6 C. & P., 18; *Johnson* v. *Windle*, 3 Bing. [N. C.], 225; *Ontario Bank* v. *N. J. S. S. Co.*, 59 N. Y., 510.) The treasurer had authority to authorize Phelps to indorse the drafts in question. (*U. S.* v. *Barker*, 4 Wash. C. C., 464; 12 Wheat., 561; *Johnson* v. *U. S.*, 5 Mason, 425; *Miltenberger* v. *Cooke*, 18 Wal., 421; *Seymour* v. *Van Slyck*, 8 Wend., 403, 422; *Smith* v. *Johnson*, 3 H. & N., 222; *Com. Bk.* v. *Norton*, 1 Hill, 501–504; *Lord* v. *Hall*, 2 C. & K., 698; *Rossiter* v. *Trafalgar, L. Ass'n*, 27 Bevan, 377.) The plaintiffs were estopped from denying that the treasurer authorized Phelps to indorse the drafts for him. (*U. S.* v. *Kilpatrick*, 9 Wheat., 735; *Gibbons* v. *U. S.*, 8 Wall., 269; *U. S.* v. *Barker*, 12 Wheat., 559; *Cooke* v. *U. S.*, 12 Blatch., 43–59; *Illinois* v. *Delafield*, 8 Paige, 527–542; S. C., 2 Hill, 159–175; *U. S.* v. *Bank of Met.*, 15 Pet., 389; *U. S.* v. *Planters' Bank of Geo.*, 9 Wheat., 904–907; *People* v. *Jansen*, 7 J. R., 332; *People* v. *Russell*, 4 Wend., 570; *People* v. *Berner*, 13 J. R., 382; *Carver* v. *Jackson*, 4 Pet., 87; Story on Agency, § 307 *a*; *White* v. *U. S.*, 3 Otto, 247, 257.) The indorsements on the drafts are as valid as they would have been if there had been no fraudulent diversion of them by Phelps. (Floyd Acceptances, 7 Wal.; Laws 1831, chap. 320, § 21; 3 Edms.

Gen. Stat., 67, 71; *Thompson* v. *U. S.*, 9 Ct. Cl. R., 187, 199.) Plaintiffs are estopped from a recovery against defendant by their laches in failing to discover and notify defendant of the alleged forgery. (*Canal Bank* v. *Bank of Albany*, 1 Hill, 287.) Defendant acting solely as agent in the course of a public employment is exempt from the strict rule applied to private servants, and would only be liable for converson in a case of actual fraud. (*Greenway* v. *Fisher*, 1 Car. & P., 190; *Lee* v. *Robinson*, 25 L. J. C. P., 249–251; *Hoffman* v. *Carrow*, 22 Wend., 285; *Isaacs* v. *Clark*, 1 Bulst., 312; *Thorp* v. *Busling*, 11 J. R., 285.) Plaintiffs having recovered possession of the drafts are entitled to no damages. (*Pease* v. *Smith*, 61 N. Y., 477; *Morgan* v. *Bk. of State of N. Y.*, 11 id., 404; S. C., 1 Duer, 434; *Ford* v. *Williams*, 24 N. Y., 359–366; *Murray* v. *Burling*, 10 J. R., 75; *Baker* v. *Freeman*, 9 Wend., 36 ; *Wheelock* v. *Wheelwright*, 9 Mass., 104; *Shotwell* v. *Wendover*, 1 J. R., 68; *Vosburg* v. *Welch*, 11 id., 175; *Whittaker* v. *Merrill*, 28 Barb., 526; *Ball* v. *Liney*, 44 id., 505; *Salt Springs National Bank* v. *Wheeler*, 48 N. Y., 492; Hilliard Rem. for Torts, 236, § 25; Stephens' Plead., 2 App'x, CXXXVI.)

*Francis Kernan*, for defendant. The drafts in question were not the property of the plaintiffs. (Const. art., 5, §§ 1, 6; 1 R. S. [6th ed.], chap. 8, 519; id., 534, §§ 6, 7, 10, 11, 13; id., 957, chap. 13, title 3, art. 2, §§ 46, 47, 69; 1 R. S. [1st ed.], 402, §§ 24, 25; id.; 419, § 5.) Title to the drafts and checks was not vested in the State by the unauthorized acts of Raines and Gallien. (*Delafield* v. *State of Illinois*, 2 Hill, 160, 175; *People* v. *Sherwin*, 2 N. Y. Sup. C. R., 528.) If the State owned the paper it is bound by the same rules of law which apply to corporations or individuals making or indorsing by agents negotiable paper. (Floyd Acceptance Case, 7 Wall., 666, 675; *Delafield* v. *State of Ill.*, 2 Hill, 160, 177; *Commissioners* v. *Aspinwal*, 21 How. [U. S.] R., 539, 545; *Mercer Co.* v. *Hackett*, 1 Wal., 83, 92, 93; *City of Lexington* v. *Butler*, 14 id., 282; *Grand Chute* v. *Wine-*

*gar*, 15 id., 356, 368, 369, 371–373: *Laynde* v. *The County*, 16 id., 7; *Thompson* v. *Lee County*, 3 id., 327.) Defendant was a *bona fide* holder of the paper and not liable to plaintiffs for receiving, collecting and paying over the proceeds. (*F.*, *etc.*, *Bank* v. *B. and D. Bank*, 16 N. Y., 125; *Belmont Branch Bank* v. *Hoge*, 35 id., 65; *N. Y. and N. H. R. R. Co.* v. *Schuyler*, 34 id., 30.) The authority of Raines as treasurer to indorse the drafts was implied. (*Com. Bk., etc.*, v. *Norton*, 1 Hill, 501–506.) The facts established that Phelps was authorized to indorse and deposit the drafts, and the fact that he fraudulently indorsed them does not render defendant liable to plaintiffs for its dealing with them. (Story on Agency, §§ 54, 55, 56, 84; *Johnson* v. *Jones*, 4 Barb., 369; *Stoney* v. *Am. Life Ins. Co.*, 11 Paige, 635, *Delafield* v. *State of Ill.*, 2 Hill, 160; *Farmers', etc., Bank* v. *Butchers, etc., Bank*, 16 N. Y., 125; *Belmont, etc., Bank* v. *Hoge et al.*, 35 id., 65; 2 Kent's Comtrs., 614, 615; *Johnson* v. *Jones*, 4 Barb., 369.) On the facts as between plaintiffs and defendant the latter should not suffer by the misconduct of Phelps. (*Farmers', etc., Bank* v. *Butchers', etc., Bank*, 16 id., 125, 132, 133, etc.; *N. Y. and N. H. R. R. Co.* v. *Schuyler*, 34 id., 30, 50, 57–68.) Plaintiffs were not entitled to recover for a tortious conversion of the drafts. (*Lockwood* v. *Bull*, 1 Cow., 322.)

EARL, J. This is an action, brought by the plaintiff against the defendant, for the conversion of ten drafts payable to the order of the State treasurer, and delivered into his office by various county treasurers for the payment into the State treasury of taxes due the State. The plaintiff recovered for eight of the drafts, numbered from one to eight inclusive, and failed to recover for two drafts, numbered nine and ten. Both parties have appealed to this court from the judgment so far as it is adverse to the party appealing.

We will first consider the appeal of the defendant. It claims that the plaintiffs did not have such title to or possession of the eight drafts as to enable them to recover for their

conversion. The argument upon its behalf is that the State treasurer had no right to receive, in payment of taxes from the county treasurers, anything but money ; that he had no right to take the drafts on behalf of the State, and hence that the State got no title to them. This argument is based upon the wording of the statutes relating to the subject, and is pressed upon our attention with great force and ability ; but it comes too late. In the case of *The People* v. *Phelps*, (72 N. Y., 334), in which the defendant had been convicted of stealing some of these drafts, we held that the State had such title to or interest in them as would sustain a conviction for larceny, under an indictment alleging ownership in the State. In that case our attention was called to the statutes regulating the duties of the county treasurers and of the State treasurer, and substantially the same argument was made against the title of the State to the drafts as has been made in this case ; but it failed to convince us. Judge FOLGER, in his able opinion in that case, shows that whatever interest the public agents took in these drafts was the interest of the State, and that their possession was the possession of the State. It would be useless to repeat his argument here or to enlarge upon it. He did not determine in that case what the precise interest of the State in the drafts was, nor what responsibilities it assumed in reference to them, and it is unnecessary to make such determination now ; because, if the State had such interest and possession as would sustain an indictment for larceny, then certainly it had such interest and possession as will enable it to maintain an action against the thief or any one taking title from or under him for a conversion. It is an established principle of criminal law, recognized by Judge FOLGER in his opinion, that to constitute the crime of larceny, the taking must be under such circumstances that the owner might maintain trespass ; (*People* v. *McDonald*, 43 N. Y., 61) ; and it is an equally well established rule of common law that an action of trover will lie where trespass *de bonis asportatis* will lie : (1 Chit. Pl., 185, 197 ; *Connah* v. *Hale*, 23 Wend., 462). We must therefore start, in this

discussion, with the fact established, that the plaintiffs had sufficient title to and possession of these drafts to maintain an action for their conversion.

The defendant further contends that, through the action of Phelps and his indorsees, it got such title to these drafts as enables it to defend against the claims of the State ; and this contention is based upon several grounds which must be carefully considered.

Phelps was a mere clerk in the treasury department, discharging such duties as the treasurer properly devolved upon him. It is claimed, on behalf of the defendant, that Phelps had actual authority to indorse these drafts, and hence that it got good title to them against the State. But it is claimed, on behalf of the plaintiff, that the treasurer could not delegate such authority to him, and that, under the statutes, no one could make a valid indorsement of the drafts but the State treasurer or his deputy. If this claim were well founded, but little further would remain to be said. But we are of opinion that it is not well founded. The statutes prescribe generally the duties of the treasurer, and authorize him to appoint a deputy, who "may perform any of the duties of the treasurer, except the signing of checks and the duties of the treasurer as commissioner of the land office, commissioner of the canal fund and State canvasser." (1 R. S. [6th. ed.], 536.) When the statutes prescribe certain duties to be performed by the treasurer in person, such duties cannot be devolved upon another. For instance, the treasurer is required to deposit all moneys that shall come into his hands on account of the State, except such as belong to the canal fund, in banks to be designated by him and the comptroller ; and then it is provided that "the treasurer shall not draw any moneys from such banks, unless by checks subscribed by him as treasurer and countersigned by the comptroller ; and no money shall be paid by either of said banks on account of the treasury, except upon such checks : " (1 R. S. 535.) The authority to sign such checks could not be delegated ; and generally the official duties of the treasurer, prescribed by

statute, must be performed by him in person or by his deputy. But there are a large number of things which must be done in the office of the treasurer which may be done by the clerks employed therein. They may receive moneys paid therein and give receipts for the same. They may make all proper entries in the books, and they may take the moneys and deposit them in the designated banks. After these drafts came into the treasurer's office, all that was to be done with them was to place them in some one of the designated banks for collection and credit to the State. They could have been made payable to the treasurer or bearer ; and, in that event, his indorsement would not have been necessary. As they were payable to his order, his indorsement was necessary. The placing his name upon the drafts for collection involved the exercise of no judgment or discretion. It was a mere formal, routine act, which anyone could be authorized by the treasurer to perform. The banks had been designated, the drafts had been received and accepted. They were to be placed in the banks for collection. As to these matters, there was no further discretion or judgment to be exercised. And there was no more discretion to be used in placing the name of the treasurer upon them and depositing them in the bank than there was in receiving a package of money and depositing that. The power to indorse and deposit the drafts was no greater or higher than the power to deposit money, and the one power could be intrusted to a clerk with just as much safety as the other, unless it so happened that larger sums came into the office in drafts than in money. It would be just as easy for a clerk to steal the money as the drafts. These drafts and the indorsements upon them were not official documents, which the treasurer, as a public officer, was required to sign or certify. Hence the rule that an agent, public or private, cannot delegate his authority, in cases requiring the exercise of judgment or discretion, does not apply : (*Commercial Bank* v. *Norton*, 1 Hill, 501; *Newton* v. *Bronson*, 13 N. Y., 587.) The referee therefore erred in holding, as matter of law, that the State treasurer could

not delegate to Phelps authority to indorse these drafts.

But this error is harmless, and the finding of law wholly immaterial, as he found, as matter of fact, that the treasurer did not direct, instruct or authorize him to make the indorsements. This finding of law could not have influenced the finding of fact, and may be disregarded. And we are of opinion that there is sufficient evidence to uphold the finding of fact. Phelps had the title in the treasurer's office of cashier, and his general duties, as found by the referee, were to keep the county treasurer's ledger and the cash book and the bank pass books, and to keep the accounts therein, and to make the bank deposits, and to make certain petty cash disbursements; and, by the general routine and custom and course of business in the treasurer's office, the deputy treasurer, when present in the office, opened the letters which were there received and handed the contents, including checks and drafts, to Phelps, whose duty it then was to enter them or cause them to be entered in the proper books and to be credited to the proper persons and to be deposited, if necessary, in bank. It was no part of his duty to indorse drafts. On the contrary, he was expressly prohibited from indorsing them. On several occasions, he assumed to indorse, and the treasurer and his deputy both testified that on every occasion when such indorsements came to their knowledge they informed him that he had no right to do it, and forbade him. But suppose it be true, that on one or two occasions when Phelps indorsed a draft, it came to the knowledge of the treasurer, and he did not go to him and express his disapproval; it could make no difference, upon the question of actual authority. The actual authority contended for by the defendant must be an authority good, as between Phelps and the treasurer, Raines, which would have been good, as against Raines, if he had been principal. Here was a general prohibition against indorsements by Phelps and an express forbiddance, on several occasions. To prevent Phelps from getting actual authority, was Raines bound to follow him up, every time he heard of any indorsement, and forbid him? We

think not. ◦ One cannot get authority to act for another, by assuming to act in spite of his prohibition. ◦ When I have once forbidden another to act for me, he can bind me only if I subsequently ratify his unauthorized acts, or acquiesce in them so long or under such circumstances that it may be inferred that I have changed my position, and am willing to be bound by his acts. I have here in mind only the question of actual authority. The question of acquiescence and apparent authority will be taken in hand further on.

In September, 1873, Raines sent to Phelps at Albany two drafts payable to his order as treasurer, with directions that he should deposit them in bank ; and Phelps indorsed the name of the treasurer upon them and deposited them as directed. It is claimed that this transaction shows that Phelps had authority to indorse drafts generally. The most that could be claimed from this is that Phelps was authorized to indorse those drafts. ◦ It does not follow, because Raines authorized him to indorse any particular draft, that he was for that reason authorized to indorse, without any direction, all drafts. But the transaction is of doubtful import. Raines may have intended and expected that when the drafts reached Albany they would be indorsed by his deputy before deposit ; and this transaction was therefore simply an item of evidence, for the consideration of the referee, upon the question of authority.

There is another transaction to which great significance is attached by the counsel for defendant.. In the summer of 1873 a draft, payable to the order of the treasurer, came into the treasurer's office and was indorsed by Phelps, in the absence of the treasurer, to the cashier of one of the deposit banks, as follows : " Pay N. D. Wendell, Esq., cashier or order. State treasurer per C. H. Phelps, cashier." Wendell, or some other holder of the draft, not being satisfied with the indorsement of Phelps, sent the draft to Raines, and he indorsed thereon the following : " Pay N. D. Wendell, cashier or order, Thomas Raines, treasurer ; " and when he

made this indorsement he saw the prior indorsement which had been made by Phelps. This transaction has not much significance. Raines did not sanction the indorsement made by Phelps or ratify it. He recognized its invalidity by making the indorsement himself. It shows that he knew that, in that instance, Phelps had assumed to indorse. But the observations above made, in reference to the two drafts, apply to this. And besides, it is left somewhat in doubt whether Raines did not object to this indorsement by Phelps. From the general evidence of Raines that he objected to every indorsement by Phelps that came to his knowledge, the referee could find that he objected to this.

Without particularizing the evidence further, we cannot say that there was not sufficient evidence to warrant the referee in finding that Phelps did not have actual authority to indorse the drafts in question.

But it is claimed further that if Phelps did not have actual or express authority to indorse, he had implied authority. It is true that authority to one to act for another need not be conferred in words. It may be inferred from the course of business and employment, and from the fact that similar transactions of the assumed agent have been acquiesced in or repeatedly recognized by the principal as done by his authority. But here there was not such acquiescence or recognition. The evidence of the treasurer and his deputy, which the referee found to be true, shows that Phelps was absolutely prohibited from making such indorsements; and that they always objected when his indorsements came to their knowledge; and that they never acquiesced in them. But even if, as claimed by the defendant, there were one or two indorsements by Phelps which came to the knowledge of the treasurer, and which he did not object to, they do not justify the inference of an authority to indorse, for the reason that they were made after the general prohibition, and after the treasurer had several times objected to indorsements which Phelps had made. One or two indorsements of drafts, which came to the knowledge of the treasurer after such drafts had

been properly deposited, do not, under the circumstances, authorize an inference of authority to indorse.

The defendant also invokes the doctrine of estoppel against the State, and claims that the plaintiffs cannot dispute the authority of Phelps to indorse these drafts. An estoppel *in pais* can arise only when a party, either by his declarations or conduct, has induced another person to act in a particular manner. It becomes important therefore to inquire, in this case, what Raines did to induce the defendant to take these drafts in reliance upon the indorsements of Phelps. He did not know of the indorsements of these drafts, and hence in no way acquiesced in such indorsements. It matters not that he permitted Phelps to be called cashier, and to receive and deposit in banks moneys, checks and drafts; that he permitted him to have a cash account in his own name, and to make certain cash disbursements, and to do a variety of other things, needless now to particularize. It matters not that Phelps made, beside the indorsements upon the drafts in question, indorsements of the same kind upon fifteen other drafts. All of such other indorsements were made without the authority of Raines; and nearly all of them were unknown to him until after all the drafts now in question were indorsed; and, so far as they came to his knowledge, they were objected to. The defendant did not know of any of those other indorsements or of any of the other facts here alluded to; and hence could not have been influenced or induced to act by them. It had no knowledge of any fact existing prior to these indorsements which induced or could induce it to suppose that Phelps had authority to make the indorsements or to deal with the drafts. It saw the indorsements, and acted upon them. It was induced to act by the unauthorized indorsements, and not by anything preceding them, or anything said or done by Raines. There is, therefore, the absence of the main groundwork of an estoppel, to wit: That the party claiming its benefit must have been induced to act in reliance upon the admissions, appearances or conduct which, he claims, the other party shall not

be permitted to gainsay. (*Dezell* v. *Odell*, 3 Hill, 215.)

It matters not that some of the drafts, which Phelps is proven to have previously indorsed to the Albany banks, came through or went to some of the banks on which some of the drafts now in question were drawn. Because, even if Raines was in any way estopped as to such drawee banks, or as to the Albany banks, the facts constituting such estoppel were unknown to the defendant, and in no way influenced its action. Even if Raines owed a duty to the drawee banks to repudiate the authority of Phelps to make indorsements, he owed no such duty to the defendant. Besides, it does not appear that Raines ever knew of any other indorsements by Phelps of drafts drawn upon the same banks upon which the drafts in question were drawn. (*Reynolds* v. *Lounsbury*, 6 Hill, 534; *Strong* v. *Strickland*, 32 Barb., 284; *Pickard* v. *Sears*, 6 Ad. & E., 475; *Freeman* v. *Cooke*, 2 Exch. R., 654; *Carncross* v. *Lorimer*, 3 Macq. H. of Lord's Cases, 829; *Morris* v. *Bethell*, L. R. 5 C. P., 47.) It is said also that the facts which existed in and about the treasurer's office, and the relations and dealings between Phelps and the treasurer were such as to give Phelps apparent authority to make these indorsements, and hence that the State is bound by them. Apparent authority operates only by way of estoppel, and can take the place of real authority only when some person has acted upon the appearances. Here the facts which are claimed to have given the apparent authority were wholly unknown to the defendant, and hence cannot be claimed to have influenced its action.

The referee found that the acts of Phelps, in indorsing and diverting from their proper use the drafts in suit, were such that the exercise of ordinary care, on the part of the treasurer, would have discovered and prevented them; and, upon this finding, the defendant seeks to base an estoppel against the plaintiffs. It certainly is not a general rule of law that a person can be deprived of his property by an unauthorized transfer thereof, simply because he has not exercised ordinary care to prevent such transfer. I may carelessly intrust a

dishonest person with my personal property, and thus put it in his power to sell it; and yet it has never been held that, in such case, my carelessness will deprive me of the right to reclaim my property, the person thus intrusted having neither the real nor apparent power to sell it. I may place my unindorsed bills in the hands of an agent, and thus place it in his power to forge an indorsement; and yet the indorsement would not bind me. The principle that when one of two persons, equally innocent, must suffer a loss by the act of a third person, he shall bear the loss who placed it in the power of such third person to perpetrate the act, does not apply to such cases. Where it is said in the books that one is estopped by his negligence as to the acts of another, who has assumed to act for him, or to deal in his property, the negligence meant is that of permitting such other person to clothe himself or to be clothed with apparent authority to act, and then the person who has been induced to rely and act upon the appearances can invoke the estoppel; and such was the case of *The N. Y. and N. H. R. R. Co.* v. *Schuyler* (34 N. Y., 30), in which the doctrine of estoppel by negligence is more fully discussed than in any other case. Here there was no negligence of Raines, in clothing Phelps with apparent authority to indorse, or in causing or permitting any appearances which caused the defendant to rely upon the indorsements. The negligence alleged is simply that Raines did not use ordinary care to discover and prevent the frauds of Phelps; and there is no authority for holding that such negligence can work an estoppel. If it could, merchants, bankers, and other business men, having numerous clerks, would frequently hold their property by a precarious tenure. And a party may also be estopped by his negligence, when his name has been forged, and for an unreasonable time he neglects, not to discover the forgery, but to give notice thereof after discovery to the party imposed on. (*Canal Bank* v. *Bank of Albany*, 1 Hill, 287.) Here there was no such negligence.

I have thus far treated this question of estoppel as if it

had arisen between two natural persons. It is claimed, however, on behalf of the plaintiffs, that an estoppel by negligence, or otherwise, cannot be invoked against the State. But it is not needful, in this case, to determine whether it can be or not, upon the facts here appearing.

But the further claim is made, on behalf of the defendant, that in dealing with these drafts, it acted in good faith, solely as agents, in the course of a public employment; and hence, that it ought not to be made liable for a conversion. But a bank is a private corporation, doing business solely for its own benefit. It may choose its own customers; and it may do or refuse to do any particular business offered. It was not bound to take these drafts, or in any way interfere with them. It was not like a common carrier who is bound to take and carry property tendered for carriage; and hence, it cannot claim the exemption from liability, which has sometimes been claimed for common carriers charged with conversion, for conveying property to its destination which had been delivered to it by one not the owner: (*Hoffman* v. *Carow*, 22 Wend., 285; *Thorp* v. *Burling*, 11 J. R., 285; *Greenway* v. *Fisher*, 1 Car. & P., 190; *Lee* v. *Robinson*, 25 L. J. [C. P.], 249). The defendant took these drafts, with the forged indorsements, from persons in the wrongful possession of them, collected the money upon them, and surrendered them up to the drawees; and that, under such circumstances, it can be sued for a conversion of them, is well settled in this State: (*Talbot* v. *The Am. Exch. Bank*, 1 Hill, 295; *Grover* v. *The Am. Exch. Bank*, 17 N. Y., 205; *Boyce* v. *Brockway*, 31 id., 490; *White* v. *Sweeney*, 4 Daly, 223; *White* v. *Mechanics Bank*, id., 225).

These drafts, after payment by the drawees, were returned to the drawers; and most of them, before this action was commenced, and all of them, before the trial thereof, came again into the possession of the State treasurer; and hence, the defendant claims a mitigation of damages. The drafts were returned to the State treasurer, by his request, under cir-

cumstances stated in a finding of the referee, as follows: " That in procuring said drafts to be sent back to him by the several county treasurers, as aforesaid, the only object and intent of said State treasurer was to use them in ascertaining the extent of the defalcation of said Phelps, and as evidence ; and that he never, at any time, indicated, or had any purpose or intent to use them or any of them, as existing obligations, against the drawers, drawees, acceptors or indorsers (except the bringing of this or other actions against persons converting the same), and that he never sent for, received, or obtained them, or any of them, with the design, purpose, or intent, of treating them as existing obligations, as aforesaid, or of enforcing them, in any way whatsoever, except by bringing actions against those parties who had converted the same, or received thereon the money belonging to the people of this State." A party whose property has been wrongfully converted is not bound to take the same back. He may abandon it, from the moment of its conversion, and sue for its value. If the wrong-doer should tender it to him, he is not bound to receive it. If it should be placed in his possession, he is not bound to accept it. If one wrongfully converts my horse, and then subsequently places him in my stable or pasture, or ties him in front of my house, I am not bound to receive or keep him. Before a wrong-doer, in such a case, can claim a mitigation of the damages for the conversion, in consequence of the return of the property, the owner must have accepted its return, or resumed his dominion over it as owner : (*Hanmer* v. *Wilsey*, 17 Wend., 91 ; *Otis* v. *Jones*, 21 id., 394). It matters not that, before the commencement of this action, the plaintiffs demanded the drafts of the defendant. It refused to deliver them upon such demand. The conversion was complete before the demand, and plaintiffs were not bound to make it. If the defendant, upon such demand, had procured the drafts, and delivered them to the plaintiffs, it could have claimed such delivery in mitigation of damages. But even after the demand, if the defendant had tendered the drafts to the plaintiffs, they

would not have been bound to accept them. The cause of action being complete, it could still have refused the drafts, and sued to recover their value.

While, therefore, we would be quite well satisfied if the defendant could escape the responsibility innocently incurred through the wrongful conduct of one in the employ of the State, it cannot thus escape, without the violation of principles of law which, in their general application, have been deemed wise and just, and the recovery against it must be sustained.

We will now briefly consider the appeal of the plaintiffs. It is claimed, on their behalf, that the referee erred, in holding that they could not recover the value of the two drafts for $20,000 each, numbered nine and ten. These drafts came into the treasurer's office in the same manner as the other eight. They were then indorsed in blank by the deputy treasurer, who had authority to indorse them, and delivered to Phelps for deposit in one of the legally designated deposit banks in Albany. Phelps filled up the blanks in the indorsements with the name of Hudson, the cashier of a firm of private bankers in New York, and delivered the drafts to that firm, and from it the defendant took them. The plaintiffs claim that the defendant got no title to the drafts by this fraudulent diversion of them. The general principle that when an agent is intrusted with negotiable paper, for a particular purpose, and fraudulently diverts it to another purpose, a person taking such paper or dealing in it in good faith will be protected, is not disputed by the plaintiffs. But their claim is that these drafts must be regarded as money; and that, by the laws of the State, the treasurer was bound to deposit them in the deposit banks legally designated; and that when the defendant found them in the hands of private bankers, in the city of New York, it had notice that they had been improperly diverted, and hence, could not have the protection of a *bona fide* taker or holder of them: (1 R. S. [6th ed.], 534). But there are two errors involved in this claim. First: The treasurer did not receive

the drafts as money, and they were not money in his hands. It was not determined, in the case of *The People* v. *Phelps*,[*] that the drafts were, in any sense, money, or that the treasurer was justified, in receiving them for taxes from the county treasurers, on the ground that they were money within the meaning of the statute. It was there held that the treasurer could receive them as one of the modes or steps for getting the money into the State treasury ; and when they became effectual for that purpose, the payment required by the statute was accomplished. Second : As these drafts were not money, the treasurer was not bound to place them in the deposit banks. He could take them and collect them from the drawees, or he could send an agent to the drawees to collect them, or he could collect them through any banks or bankers whom he chose to employ. But when he had obtained the money on them, in any of these ways, then, under the statute, he was bound to deposit that. Hence the fact that these drafts, properly indorsed by the deputy treasurer, were in the hands of private bankers, in the city of New York, was not such absolute notice to the defendant that they had been wrongfully diverted that it must be charged with bad faith in dealing with them. The decision of the referee, therefore, as to these two drafts, was right.

To conclude the whole discussion, in the final analysis of this case, the claim of the defendant to the eight drafts may be answered by the application of the elementary principle, that one who takes property (not negotiable instruments) from or under a thief or other person who has wrongfully converted the same, can have no better title than the wrong-doer had ; and the claim of the plaintiffs to recover for the two drafts may be answered by the application of the principles which protect one who in good faith takes or deals in negotiable paper.

The judgment must be affirmed, with costs to each party on appeal of opponent.

[*] 72 N. Y., 334.

FOLGER, RAPALLO and ANDREWS, JJ., concur; MILLER, J., concurs in result; CHURCH, Ch. J., concurs as to the two drafts found on against plaintiffs and for reversal as to balance.

Judgment affirmed.