ISAAC MAURICE JACOBS, Appellant, Respondent, *v.* JOSEPH H. MOORE and Others, Copartners, Doing Business under the Firm Name and Style of MOORE, LEONARD & LYNCH, Respondents, Appellants.

First Department, March 4, 1921.

Principal and agent — stockbrokers — evidence not establishing conversion of stock — acceptance of check and retention of proceeds thereof by customer constitutes ratification of broker's acts respecting sale of stock.

In an action by a customer against a firm of stockbrokers for the alleged conversion of stock, the question was presented as to whether the defendants had agreed to carry said stock for the plaintiff as claimed by him, or whether the sale was to be strictly for cash, the balance to be paid on a certain date, as claimed by the defendants.

*Held*, on all the evidence, that the defendants did not convert the stock by a sale thereof on plaintiff's failure to pay, and that their motion for a dismissal of the complaint should have been granted.

Where a customer accepts a check from his stockbroker for an unliquidated claim and retains the proceeds thereof, he thereby ratifies the broker's acts as his agent, and cannot thereafter be heard to dispute or repudiate the same or claim damages for an alleged conversion of the stock involved.

PAGE, J., dissents, in part.

CROSS-APPEALS by the plaintiff, Isaac Maurice Jacobs, and by the defendants, Joseph H. Moore and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 10th day of July, 1920, upon the verdict of a jury rendered by direction of the court.

*John E. O'Brien* of counsel [*Charles J. Katzenstein,* attorney], for the plaintiff.

*Reese D. Alsop* of counsel [*Hunt, Hill & Betts,* attorneys], for the defendants.

MERRELL, J.:

This action was brought to recover the sum of $10,000 and interest, damages which the plaintiff claims to have suffered by reason of the conversion by the defendants of 5,000 shares of stock of the Mines Holding Company, a Delaware corporation. The defendants are copartners doing business as stockbrokers in the city of New York and elsewhere under the firm name and style of Moore, Leonard & Lynch. The plaintiff is the president and treasurer of a weekly publication known as the *New York Financial Examiner,* published in the city of New York.

For many years prior to the occurrences involved in this action plaintiff had speculated extensively in stocks and securities. In his complaint the plaintiff alleges that in April, 1917, the defendants, as stockbrokers, agreed to and with the plaintiff to purchase for him 5,000 shares of stock of said Mines Holding Company, and that in consideration thereof the plaintiff agreed to pay the defendants therefor the purchase price of said stock, together with their commissions thereon. The plaintiff alleges that the defendants did, upon plaintiff's order and pursuant to their agreement with the plaintiff, on or about April 30, 1917, purchase in the market for the account of the plaintiff 5,000 shares of the stock of said corporation at the price of $1.25 per share, and thereafter held the same as the stockbrokers and agents of the plaintiff and for his account; that at the time of employing the defendants to purchase said shares the plaintiff deposited with said defendants the sum of $1,100 and agreed to pay the

balance of the purchase price of said shares of stock when the defendants should obtain and deliver the same to the plaintiff. The plaintiff alleges that thereafter he duly offered and tendered to defendants the balance of the purchase price of said stock and demanded delivery thereof, but that defendants refused to accept such balance of the purchase price or to deliver to the plaintiff such shares of stock, but, without the leave, consent or permission of the plaintiff and contrary to his express directions, converted said shares to their own use and benefit and sold or otherwise disposed thereof. Alleging that said shares of stock were worth thereafter in the market at divers time $2 per share, the plaintiff claims to have suffered damage by reason of defendants' acts in the sum of $10,000, for which judgment is demanded.

The defendants answered in the action denying generally the agreement alleged and set forth in plaintiff's complaint and the other allegations in plaintiff's complaint with reference to the deposit by the plaintiff with the defendants of the $1,100 for the purposes set forth in the complaint, the purchase of the stock, its conversion, and that plaintiff has suffered the damages alleged and set forth in said complaint.

The defendants, as a separate defense, allege in their answer that on or about April 26, 1917, at the plaintiff's request and upon his promise to pay therefor in full forthwith, together with a commission to the defendants as stockbrokers, and upon plaintiff's deposit with the defendants of the sum of $600 on account of the purchase price thereof, the defendants agreed to buy for plaintiff 3,000 shares of the stock of said Mines Holding Company at $1.25 per share, or less, if the same could be bought in the market, it being expressly understood and agreed by and between the plaintiff and defendants that defendants would not carry the said stock on a margin for the plaintiff's account, and that plaintiff would pay the defendants for the same in full, with the commission, when the same was bought. The defendants allege that on April 28, 1917, pursuant to said agreement, they bought 3,000 shares of the stock of said company at $1.25 per share. Defendants further allege that thereafter and on April 28, 1917, at plaintiff's request and on his promise to pay therefor in full forthwith, together with a commission to defendants as stockbrokers,

the defendants agreed to buy for plaintiff 2,000 more shares of the stock of the Mines Holding Company at $1.3125 per share, or less, if the same could be bought at such price in the market, and that it was expressly understood and agreed by and between the plaintiff and the defendants that the defendants would not carry said stock on a margin for plaintiff's account, and that the plaintiff would pay the defendants for same in full, with commission, when bought, and that the defendants, pursuant to such agreement, did thereafter and on April 28, 1917, purchase for plaintiff said 2,000 additional shares of the stock of said company, paying therefor $1.25 per share.   At the time of ordering defendants to purchase the additional 2,000 shares of said stock plaintiff deposited with the defendants the sum of $500.   The defendants further allege that on or about said April 28, 1917, the agreement under which the defendants had purchased the 5,000 shares of said stock was by mutual agreement between the parties amended, defendants consenting and plaintiff expressly agreeing to pay defendants the full purchase price of said 5,000 shares of stock, together with a commission to the defendants, on or before Wednesday, May 2, 1917, in full settlement therefor.   The defendants further allege that plaintiff wholly failed and refused to perform said contract on his part and refused and failed to pay the defendants the balance of the purchase price of said stock on May 2, 1917, as he had agreed, and thereby by his breach and default released and discharged the defendants from all liability or obligation under said contract. Defendants further allege that thereafter and on or before May 4, 1917, the defendants sold 4,000 shares of said stock in the market at $1.375 per share and the remaining 1,000 shares at $1.3125 per share, and on or about said last-mentioned date duly notified the plaintiff that said stock had been sold; that plaintiff objected to said sale and disputed the right of the defendants to have made the same.   The defendants further allege that thereafter and on or about May 8, 1917, the defendants duly delivered to the plaintiff a letter and statement showing the sale of the 5,000 shares of said Mines Holding Company stock as above described and notifying the plaintiff that defendants had charged him interest amounting to $5.52 on the transaction and a commission of one thirty-

second of $1 for buying said stock and a like commission for selling the same, and that there then remained due in accordance with the statement then furnished by defendants to the plaintiff the sum of $1,342.98, and that at the same time the defendants delivered to plaintiff their check for said last-mentioned sum, together with said statement; that plaintiff duly accepted said statement and check in full settlement of all accounts between them and made no objection to said statement within a reasonable time thereafter and cashed said check and has always retained the money received therefrom.

For a second separate defense the defendants allege, upon information and belief, that for a month or more following May 4, 1917, when they sold and disposed of said shares of stock upon the market, said stock could have been purchased at one dollar and twenty-five cents per share, and that at no time after said May 4, 1917, did the price of said stock in the market exceed the sum of one dollar and thirty-seven and one-half cents per share. The defendants further allege that a month or more after May 4, 1917, transactions in the market in the said stock ceased.

The issues raised by the pleadings coming on for trial, the parties stipulated in open court to try the case without a jury, and that the court might direct a verdict with the same force and effect as though a jury were present.

Upon the trial the plaintiff testified that he was in the city of Pittsburgh, Penn., where the defendants maintained a branch office; on April 26, 27 and 28, 1917. It was stipulated upon the trial that on April twenty-sixth and twenty-seventh the plaintiff requested the defendants to purchase 5,000 shares of the stock of the Mines Holding Company, and that the defendants promised to do so upon receipt of $200 per 1,000 shares, and that plaintiff thereupon paid the defendants $1,100; that on April 28 or 30, 1917, the defendants purchased for the plaintiff said 5,000 shares of stock at $1.25 per share, or a total of $6,250; that for that service the defendants charged the plaintiff a commission of one-thirty-second of $1 a share, or a total commission of $156.50. It was further stipulated that on May 3, 1917, the defendants telegraphed from their Pittsburgh office to plaintiff at Detroit, as follows:

" 5:50 P. M., Pittsburgh, Pennsylvania. May 3rd, 1917,

I. M. Jacobs, Hotel Statler, Detroit, Michigan (care of R. A.). You have not paid for the five thousand shares of Mines Holding Company stock as you promised. Will sell same at ten o'clock May 4, 1917, on New York curb unless payment in full in our hands before that time. Moore, Leonard & Lynch," and that the plaintiff received said telegram in Detroit on the morning of May 4, 1917.

Thereupon, in the course of the trial, the defendants made certain admissions to the effect that plaintiff, on or about April 27 and 28, 1917, had employed the defendants to purchase for him 5,000 shares of the Mines Holding Company stock, depositing with the defendants the sum of $1,100 on account thereof, and that pursuant to such employment the defendants did purchase for plaintiff's account said 5,000 shares of said stock, paying therefor at the rate of $1.25 per share, and charging the plaintiff therefor the sum of $6,250 together with their commission, amounting to $156.50, and that on April 28, 1917, the defendants gave to plaintiff a statement to that effect, crediting plaintiff with the payment of $1,100 on account thereof.

With reference to the transaction between the parties, the plaintiff testified that he went to the Pittsburgh office of the defendants on April 26, 1917, and solicited a subscription for his periodical, and that defendants' representative there, a man by the name of Lamb, subscribed for said periodical, paying plaintiff $2 therefor. Plaintiff testified that he then told Lamb, defendants' representative, that he wanted to buy a few thousand shares of Mines Holding, and gave Lamb an order that day to purchase 3,000 shares of said stock and paid Lamb $600 upon account. Plaintiff further testified that there was conversation between himself and Lamb as to when he would pay the balance of the purchase price of said stock, and that the plaintiff said: " When you have received the stock I will pay for it. It will take about ten days before you get that stock, and I will notify you if I happen to come back to Pittsburgh in the meantime." Plaintiff testified that he told Lamb he would be there and come and see them, or that they might notify his New York office, and that he could pay them either at the office in Pittsburgh or in their office in New York, which was just across Broadway from

plaintiff's New York office. Plaintiff testifies that he told defendants' representative that he was going to visit his daughter and would go and make several western towns in the interest of his paper, and would keep him posted where plaintiff was at all times. Plaintiff further testified that he received on April 28, 1917, from the defendants a statement, which was introduced in evidence, showing the account between himself and the defendants for the purchase of the 5,000 shares of Mines Holding Company stock; that it appeared by that statement that he had paid the defendants therefor in cash on April twenty-sixth $600 and on April twenty-seventh $500, and that the balance of the purchase price for said stock was $5,306.30. The plaintiff testified that after spending several days with his daughter in Cleveland, he then went to the city of Detroit, arriving there on the morning of May 4, 1917; that he proceeded to the Hotel Statler at Detroit, and upon his arrival found a telegram from the defendants notifying him that unless they received the balance of the purchase price of said stock at or before ten o'clock on May 4, 1917, they would sell the same on the market for his account. Plaintiff testified that this telegram was received and read by him about nine o'clock A. M., on May fourth, Detroit time. He testified that he immediately went to the telegraph office and telegraphed the defendants that under no circumstances were they to sell said stock and directing them to ship the same with draft attached to his New York office. Plaintiff further testified that he immediately made an effort to reach the defendants' Pittsburgh office over the long distance telephone, and within half to three-quarters of an hour obtained connections with defendants' Pittsburgh office and was informed that his stock had already been sold. Later on in the day plaintiff testified that he received another telegram from the defendants in response to his telegram, as follows:

" Your telegram received. You failed to pay for stock pursuant to your promise two days ago and still fail to place Pittsburgh or New York office in funds. Have sold four thousand shares at one and three-eighths and one thousand at one and five-sixteenths."

The plaintiff testified that he at once returned to New York, reaching the latter city on May sixth, and that he immediately

visited the defendants' office and had a conversation with Mr. Leonard, one of the defendants, saying to him, " Mr. Leonard, I am here to take up that stock that you bought for me," and that Leonard ordered him out of the office and directed him to see defendants' attorney, refusing to talk with the plaintiff. Upon cross-examination the plaintiff admitted that on or about May 8, 1917, he received from the defendants a letter in the following form:

"NEW YORK, *May* 8, 1917.

" Mr. I. M. JACOBS,

"7 Pine Street,

"New York, N. Y.:

" DEAR SIR.— Enclosed you will find check for $1342.98, closing out your account with us. 4000 shares were sold at 1–3/8 and 100 shares at 1–5/16. There is an interest charge of $5.52, and we have charged you 1/32 for buying and 1/32 for selling the stock.

"Yours very truly,

" EWL-L.          MOORE, LEONARD & LYNCH."

That inclosed in said letter was the check for $1,342.98 therein referred to. Plaintiff further admitted that he had indorsed said check by writing his name upon the back thereof. The evidence shows that the plaintiff received said check without objection, and cashed the same, and retained the proceeds thereof.

Owing to the illness of the wife of defendants' Pennsylvania manager, Mr. William J. Lamb, the latter was unable to be present upon the trial as a witness, and upon stipulation of the parties it was agreed that if said Lamb were present he would testify that the plaintiff came to the defendants' Pittsburgh office on April 26, 1917, and asked Lamb if the defendants would buy 3,000 shares of the stock of the Mines Holding Company on the New York curb and carry it for him on margin; that Lamb replied that the defendants would not carry the stock, as they made it a general custom not to carry stocks on margin which were only dealt in on the New York curb, and that plaintiff then asked him how much the defendants would want by way of deposit against ordering 3,000 shares of the stock for him, and that Mr. Lamb replied that they would

order the stock upon deposit of $200 per 1,000 shares, but upon the understanding only that the stock would be paid for in full, and that the defendants would not carry it on margin; that plaintiff thereupon deposited $600 with defendants and requested them to purchase for him 3,000 shares of said stock at $1.25 per share; that on April 28, 1917, plaintiff again called at defendants' Pittsburgh office, the defendants in the meantime having been unable to fill plaintiff's order; that plaintiff then raised his bid to $1.31¼ per share, and further requested defendants to buy 5,000 instead of 3,000 shares and deposited with the defendants against said order an additional $500; that Lamb again stated to the plaintiff that it would have to be a cash transaction, and they would not carry the stock for him on margin, but that he would have to pay for it in full; that plaintiff acquiesced in such arrangement, and that at two o'clock on the same day, which was Saturday, plaintiff again came to defendants' Pittsburgh office and requested a statement, which was given him, showing the purchase by the defendants for plaintiff of 5,000 shares of said stock at $1.25 per share; that defendants charged him the usual brokers' commission of one thirty-second of $1 per share, said commissions amounting to $156.50, and that the purchase price of the stock was $6,250; that after crediting plaintiff with $1,100 which he had paid there remained owing to defendants on account of the transaction and the purchase of the stock a balance of $5,306.50; that upon receiving such statement plaintiff stated that he was leaving Pittsburgh for Cleveland, O., to see his daughter, and that he would be back on Wednesday, May 2, 1917; that Lamb again stated that the defendants would not carry the stock on margin for the plaintiff, and that the plaintiff would have to pay for it in full on Wednesday, May 2, 1917, when he came back from Cleveland, and that the plaintiff stated that he would do so; that plaintiff then left without giving any address where he could be reached, beyond having shown Lamb a copy of a publication called the *New York Financial Examiner*, which bore upon its cover the plaintiff's name as editor; that when the plaintiff did not appear at or communicate with defendants' Pittsburgh office on Wednesday, May second, Lamb and the defendants tried to locate him through the defendants' New York office, through the

*New York Financial Examiner,* to which he had referred, and in numerous other ways endeavored to locate the plaintiff, finally tracing him through Hotel Statler, Cleveland, to Hotel Statler, Detroit; that on Thursday, May 3, 1917, in the afternoon, defendants telegraphed plaintiff at Detroit, calling his attention to his failure to pay for the 5,000 shares of stock as he had promised, and notifying plaintiff that defendants would sell said stock at ten o'clock on May 4, 1917, on the New York curb unless the amount in full was received in their hands before that time; that after ten o'clock A. M. on May fourth the defendants received at their Pittsburgh office the following telegram:

"Moore, Leonard & Lynch,
          " Pittsburgh, Pa.:
   " Under no circumstances sell stock, ship draft attached New York office.                    I. M. JACOBS."

That later in the day Lamb talked with plaintiff over the long distance telephone in Detroit, and that plaintiff in his conversation demanded that defendants buy back the stock and stated that if defendants did not do so he would put the matter in the hands of attorneys; that plaintiff then for the first time informed Lamb that he had an office at 7 Pine street, New York city; and stated that he would be prepared to pay in full for the stock Monday, May 7, 1917, that Lamb stated to plaintiff that the stock had already been sold; that on May 7, 1917, the defendants received at their office in Pittsburgh a letter from plaintiff, dated May 6, 1917. In said letter the plaintiff expressed surprise at the sale of the 5,000 shares of Mines Holding stock bought through the defendants, and charging the defendants with illegal action in respect to such sale, and advising defendants to buy in said stock for cash for immediate delivery and avoid further damages and loss, and also stating that charges might be brought against them before the committee of the New York Stock Exchange for misconduct. In this letter the plaintiff also suggests that he might tell certain New York newspapers of the transaction, to defendants' disadvantage, and makes other suggestions of a threatening nature.

The evidence upon the trial presented a question of fact as to whether the defendants had purchased the 5,000 shares of stock and had agreed to carry the same for the plaintiff as claimed by him, or whether the transaction was as contended by the defendants, that the sale was to be strictly for cash, and that payment of the balance of the purchase price was to be made on May 2, 1917. If the plaintiff was right, then the defendants converted said stock by their sale thereof on May fourth upon the curb market, and are liable to the plaintiff for such damage as he has sustained by reason of such conversion. If, on the other hand, the sale was to be for cash, as claimed by defendants' Pittsburgh manager, Lamb, then the defendants, upon plaintiff's default, had a right to sell plaintiff's stock on his account as they did. By the sale on the curb on May 4, 1917, the entire 5,000 shares were sold at a profit, and, after deducting from the proceeds of such sale plaintiff's indebtedness for said stock, together with commissions, there remained a balance due plaintiff of $1,342.98, which sum defendants paid to the plaintiff by check. This left a net gain to the plaintiff in the transaction of $242.98.

At the close of the testimony, the court, it seems to me, contrary to the weight of the evidence, held with the plaintiff that there had been a conversion by the defendants of plaintiff's stock, but that it was plaintiff's duty to make defendants' loss as small as possible, and requested that the attorneys submit a computation as to the value of said stock at five, ten, fifteen, twenty, twenty-five and thirty days after the same was converted by the defendants, the court holding, in effect, that it was the duty of the plaintiff to lessen the loss and to go into the market and purchase the stock in order to lessen the damages suffered. Thereafter the court directed a verdict in favor of the plaintiff for $492.83. It is impossible to learn from the record the basis whereby the court arrived at the amount for which said verdict was directed. So far as I have been able to discover, there is no basis in the evidence upon which the learned court could have properly directed the verdict which it did.

Both sides appealed from the judgment entered upon such directed verdict, the plaintiff claiming that the amount awarded him was inadequate, and the defendants contend-

ing that the judgment was in all respects erroneous and unauthorized.

It seems to me that under the facts presented by the evidence upon the trial the court improperly denied the defendants' motion to dismiss the complaint upon the ground that in accepting defendants' check for $1,342.98 and cashing the same and in retaining the proceeds thereof, the plaintiff clearly ratified the sale of his stock by the defendants. The court has held that the defendants converted plaintiff's 5,000 shares of stock. The plaintiff finally claimed as damages a balance of $3,345.25, besides interest thereon from May 4, 1917, whereas, the defendants insisted that in accordance with the statement which they furnished the plaintiff the transaction showed there was due plaintiff from the defendants thereon a balance of $1,342.98, a net profit in the transaction to plaintiff of $242.98. Under these circumstances, the parties claiming as above stated, the defendants delivered to the plaintiff their check upon his unliquidated claim for $1,342.98. This check was accepted and retained by the plaintiff, and I think was a complete ratification by him of the defendants' acts as his agents, and that he cannot afterward be heard to dispute the same or to repudiate his agents' acts. The action was not upon contract, nor were the damages which the plaintiff suffered liquidated, and I think plaintiff's acceptance of defendants' offer in full settlement of this unliquidated claim, together with the statement of the transaction in connection with defendants' purchase of said shares of stock, and the retention by the plaintiff of the moneys paid him, acted as a ratification by the plaintiff of the defendants' acts.

I am, therefore, of the opinion that the trial court committed error in denying defendants' motion for a nonsuit and a dismissal of the complaint at the close of the evidence. The judgment of the Trial Term should be reversed upon defendants' appeal, with costs to the defendants, appellants, against the plaintiff, appellant, and the complaint dismissed, with costs. This disposes of plaintiff's appeal from the judgment for inadequacy of the verdict, but we do not allow costs to the defendants, appellants, upon plaintiff's appeal.

CLARKE, P. J., LAUGHLIN and SMITH, JJ., concur.

PAGE, J. (concurring):

I concur in the opinion of Mr. Justice MERRELL that the decision of the trial justice was contrary to the weight of the evidence, in holding that the defendants converted the stock of the plaintiff. In my opinion the plaintiff failed to establish by a preponderance of the evidence that the defendants agreed to carry the stock for him until a transfer thereof should be made on the books of the company and the certificates of stock so transferred should be received by the defendants. On the contrary, in my opinion the evidence on behalf of the defendants shows that the plaintiff promised to pay the balance due on or before Wednesday, May 2, 1917, and on plaintiff's failure the defendants had the right to sell the stock to satisfy their lien for the moneys advanced. The trial justice should have directed a verdict for the defendants.

In my opinion the court would not have been justified in dismissing the complaint upon the ground that in accepting the defendants' check for $1,342.98, cashing the same and retaining the proceeds thereof, the plaintiff ratified the sale of his stock by the defendants.

The action was for a conversion. The conversion would be complete if the defendants made an illegal sale of plaintiff's property, and plaintiff became entitled to his damages, which would be the full value of the property. A subsequent return of the property, or the turning over of the proceeds of the sale thereof, would only go to the mitigation of the damages and not to the defeat of the cause of action. (*People* v. *Bank of North America,* 75 N. Y. 547, 564.)

Judgment reversed, with costs to defendants, and complaint dismissed, with costs.