JOHN COLLINS, RESPONDENT, *v.* STEPHEN RALLI AND OTHERS, APPELLANTS.

*One converting to his own use goods intrusted to him for delivery to another, is guilty of larceny — One purchasing from a person having the bare possession of goods is not protected as against the true owner — Warehouse receipt, issued to one not the owner — a bona fide purchaser from such person is not protected thereby — Section 6, chapter 326 of 1858 — Chapter 179 of 1830.*

H. M. Cutter, a cotton broker, called upon the plaintiff, and by falsely and fraudulently representing that he was authorized to purchase cotton for certain mills in Massachusetts, induced the plaintiff to sell certain cotton to said mills, and deliver to him a bill of sale thereof to the mills. Upon the representation that he desired to ship the cotton immediately Cutter procured from the plaintiff a delivery order upon the warehousemen, at whose warehouse Cutter had the cotton weighed and marked and loaded upon a truck; tags, with the name and address of the mills, being fastened to each bale. Subsequently Cutter stored the cotton in another warehouse, some of the bales at that time still having the tags upon them, and took out receipts therefor from the keeper of such warehouse in his own name first, and afterwards in the name of his brokers. All the tags were removed from the bales while in this latter warehouse. Thereafter the defendants purchased the cotton in good faith and for value through their brokers, receiving the warehouseman's receipts therefor, and subsequently shipped it to Liverpool.

It appeared that all the transactions between the plaintiff and Cutter were done in accordance with the usual custom, where goods were purchased by manufacturing companies through brokers.

Cutter having absconded without paying for the cotton the plaintiff brought this action against the defendants to recover the value of the cotton received and converted by them.

*Held,* that Cutter was guilty of larceny in fraudulently obtaining the temporary custody of the cotton and thereafter converting it to his own use, and that the defendants acquired no title to it by reason of his transfer of it to them.

That ██ the plaintiff had merely intrusted Cutter with the temporary possession o██ ██ton to enable him to weigh, tag and cart it for shipment to the pre-██rchasers, and had never conferred upon him the apparent title t██ ██ any authority to dispose thereof, the plaintiff was not estopped from reng it from the defendants, though they had purchased it in good faith.

*Craig* v. *Marsh* (2 Daly, 61), overruled.

That the defendants were not protected by section 6 of chapter 326 of 1858, providing that warehouse receipts may be transferred by indorsement, and that any person to whom the same may be transferred shall be deemed and taken to be the true owner of the goods therein specified, so far as to give validity to any pledges, lien or transfer made or created by such person or persons; as such provision only applies to receipts given for goods stored or deposited by

persons having the title thereof, whether real or apparent, or authority so to do from such real or apparent owner.

How far the tags remaining upon the bales were notice of the true ownership of the cotton to the second warehouseman, considered.

APPEAL from a judgment in favor of the plaintiff, entered upon the report of a referee.

The referee found that on or about the 28th day of December, 1877, Henry M. Cutter, a member of the firm of H. M. Cutter & Co., cotton brokers, in New York, stated and represented to the plaintiff, who was a dealer in cotton in said city, that his (Cutter's) said firm had an order from the Freeman Manufacturing Company, of North Adams, Massachusetts, to purchase for them 100 bales of cotton. The standing and responsibility of said manufacturing company was good, and known to plaintiff so to be.

That said H. M. Cutter & Co offered to purchase from plaintiff 100 bales of cotton for said Freeman Manufacturing Company, at 11⅞ cents per pound, and plaintiff relying upon the statements and representations of said Cutter, and believing them to be true, accepted said offer and agreed to sell said cotton to said Freeman Manufacturing Company at said price, and thereupon said Cutter made out, subscribed in the name of his said firm as brokers, and delivered to plaintiff, a sold note, dated December 28, 1877, containing the name of the plaintiff, and stating in substance that said H. M. Cutter & Co. had sold for plaintiff's account to the Freeman Manufacturing Company 100 bales of cotton at 11⅞ cents per pound, payable in twelve days. That said cotton was at the time of said transaction stored in the warehouse of C. L. Brust at Nos. 90 and 92 West street, in the city of New York.

Cutter stated to plaintiff that he desired to ship said cotton to said manufacturing company immediately, as they needed it for use in the mills, and accordingly, on said December 28, 1877, plaintiff gave said H. M. Cutter & Co., at their request, an order on said Brust for the delivery of fifty bales of said cotton to them for immediate shipment to said manufacturing company, and on December 31, 1877, he gave them a like order for the delivery of the remaining fifty bales thereof for like shipment, and that

upon said orders said Brust delivered said cotton on said days to H. M. Cutter & Co., and shipping tags were by them attached to the bales addressed to said manufacturing company at North Adams, Massachusetts, and said cotton, as fast as it was so weighed, marked and tagged, was carted off by said H. M. Cutter & Co.'s truckman, O'Donnell, to be shipped, as plaintiff was told by said Cutter and supposed, to said Freeman Manufacturing Company.

That on or about the 2d day of January, 1878, and on the 9th day of January, 1878, more cotton was procured by Cutter from the plaintiff by similar representations.

That at or about the time of the delivery of said cotton to H. M. Cutter & Co. for shipment, as aforesaid, plaintiff made out bills or memoranda of sale of said respective lots of cotton to the pretended purchasers, and delivered them to said H. M. Cutter & Co., each to be sent to the company named therein. Cutter did not ship any of the cotton to any of the pretended purchasers, nor had he or any member of his firm any authority to buy cotton for them.

That said H. M. Cutter & Co. had their said truckman, O'Donnell, cart all said cotton, consisting of 300 bales, directly from said warehouse to the warehouse of John S. Richards, at No. 618 Washington street, in the city of New York, and there stored it in the name of H. M. Cutter & Co.

That said Cutter instructed said truckman O'Donnell to tear the tags from said cotton while he was conveying it to said Richards' warehouse, and that a number of said tags were so torn off by said O'Donnell, but that a large number of them remained on said cotton when it was stored in said Richards' warehouse, and were seen by said Richards thereon, and that after being so stored they were torn off while in said warehouse.

That as fast as said cotton was stored in said Richards' warehouse, as aforesaid, said H. M. Cutter & Co. procured said Richards to issue to them negotiable warehouse receipts therefor, in the name of G. H. Price & Co., cotton brokers, whom they frequently employed in their business, and said Price & Co. thereupon indorsed and transferred said warehouse receipts for said H. M. Cutter & Co. to the defendants for value ; Richards there-

after delivered the cotton, upon the surrender to him of said warehouse receipts issued therefor, and defendants then shipped said cotton to Liverpool, England, and sold the same and converted the same and the proceeds thereof to their own use before the the commencement of this action.

That plaintiff was guilty of no negligence, in any of the transactions above stated, but in all respects exercised due care and caution therein, and all his acts in respect thereto were in the usual and ordinary course of business of selling cotton to spinners through the medium of a broker.

That plaintiff parted with the custody of said cotton to said .H. M. Cutter & Co. for the sole purpose of having the same shipped and delivered to the pretended purchasers.

*Coudert Brothers*, for the appellants. This case falls within section 6 of chapter 326 of the Laws of 1858. (*Geneva National Bank* v. *Reamer et al.*, 7 W'kly Dig., 462; *Yenni* v. *McNamee*, 45 N. Y., 619; *McCombie* v. *Spader*, 1 Hun, 195, 196.) Plaintiff is estopped, as against the defendants, from claiming that Cutter could convey no title. (*McNiel* v. *Tenth National Bank*, 46 N. Y., 329; see also *Babcock* v. *Lawson*, [Q. B.], C. J. COCKBURN, 20 Albany L. J., 407; *Craig* v. *Marsh*, 2 Daly, 61, opinion BRADY, J., at General Term; *Moyce* v. *Newington*, 4 Q. B. D., 32 [Law Review, July, 1879, 697]; *McGoldrick* v. *Willetts*, 52 N. Y., 612; *Paddon* v. *Taylor*, 44 id., 374; *Root* v. *French*, 13 Wend., 570; *Wait* v. *Green*, 36 N. Y., 556.) Cutter did not obtain the goods feloniously, *i. e.*, by larceny. (4 Blackstone [Chitty], 230; *Rex* v. *Atkinson*, 2 East. Pleas of the Crown, 673; *Mowry* v. *Walsh*, 8 Cow., 242; *McGoldrick* v. *Willetts*, 52 N. Y., 612; *Craig* v. *Marsh*, 2 Daly, 61; *Zink* v. *The People*, 74 N. Y.; *Loomis* v. *The People*, Ct. of App., 1879; *Weyman* v. *The People*, 4 Hun, 571; *Smith* v. *The People*, 53 N. Y., 113.)

*Freling H. Smith*, for the respondent. Cutter & Co. obtained possession of the cotton feloniously. (*Loomis* v. *The People, etc.*, 67 N. Y., 327; *Smith* v. *The People* 53 id., 113; *Bassett* v. *Spofford*, 45 id., 391; *Weyman* v. *The People, etc.*, 4 Hun, 561; *Zink* v. *The People*, Ct. of App., 6 Abb. [N. C.], 413.)

## 250 COLLINS v. RALLI.

Plaintiff conferred no *indicia* or apparent right of property on Cutter & Co. The authorities are uniform that the mere parting with the possession of goods to a person does not enable him to convey title to them. (*McNiel* v. *Tenth National Bank*, 46 N. Y., 325; *Covell* v. *Hill*, 4 Denio, 327; *Ballard* v. *Burgett*, 40 N. Y., 314; *Barnard* v. *Campbell*, 55 id.; 463; *S. C.*, 58 id., 76; *Barker* v. *Dinsmore*, 72 Penn., 427; *Marine Bank of Buffalo* v. *Fiske*, 71 N. Y., 358; *Cundy* v. *Lindsay*, 38 L. T. Rep. [N. S.], 573; *Fowler* v. *Hollins*, 7 Q. B., 616; *Hintz* v. *Idaho*, 3 Otto, 583; *Lickbarrow* v. *Mason*, 2 T. R., 62.) The defendants are not protected by chapter 326 of the Laws of 1858. (3 Edm. R. S., p. 667; *Tracy* v. *The Troy and Boston R. R. Co.*, 38 N. Y., 437; *M. and T. Bank of Buffalo* v. *F. and M. Bank*, 60 id., 52; *Howland* v. *Woodruff et al.*, 60 id., 73; *First Nat. Bank of Toledo* v. *Shaw*, 61 id., 283; see also *Bates* v. *Cunningham*, 19 N. Y. S. C. [12 Hun], 21.)

Pratt, J.:

The facts in this case clearly show that Cutter & Co. were guilty of larceny in obtaining the temporary custody of, and appropriating to their own use the cotton in question in this action. They had, by false and fraudulent statements, induced the plaintiffs to believe that they represented and were authorized to purchase this cotton for certain manufacturing companies, and relying upon their representation, the plaintiff sold the same to these manufacturing companies as he supposed through Cutter & Co., as brokers, and so they were allowed to put the cotton aboard their trucks after it had been tagged and addressed to the supposed purchasers for conveyance to the depot for shipment.

This was done in pursuance of the usual custom obtaining in respect to shipment of goods purchased by manufacturing companies through brokers.

In such cases it appears the dealer allows the broker to cart the goods for shipment. The possession of Cutter & Co. was therefore temporary, and given to them for a specific purpose, and they procured such possession fraudulently and with the purpose and design of converting the goods to their own use. The evidence, which is undisputed, shows this conclusively.

The case is therefore brought directly within the definition of larceny given in *Loomis* v. *The People* (67 N. Y., 322); and also 2 R. S., p. 679, § 63; *Smith* v. *The People* (53 N. Y., 113; *Bassett* v. *Spofford* (45 id., 391); *Zink* v. *The People* (6 Abb. [N. C.], 413); 2 East's P. C., 681, 693.

The defendants rely upon *Rex* v. *Atkinson* (2 East's P. C., 673) as an authority in opposition to these views ; but in that case the offence charged was held not to be a *felony* simply, as it came within the statute of 33 H. 8th Ch., 1, against obtaining goods by false tokens or counterfeit letters, and was therefore punishable as a *misdemeanor* only (East. P. C., 687). Whether or not Cutter & Co. were guilty of larceny, however, is important in the determination of the case only upon the question of estoppel, for it cannot well be claimed that an owner has conferred upon the thief indicia of title to his stolen goods, or that he cannot reclaim them because of any negligence charged. (*Bassett* v. *Spofford, supra.*)

Whatever may be the grade of the offence of Cutter & Co. in defrauding plaintiff of his goods, they could convey no title to them even to an innocent purchaser for value unless plaintiff committed, or omitted some act in respect to them whereby such purchaser was, and a prudent person would naturally be, misled by some apparent ownership or power of Cutter & Co., or their representatives in or over the same, created by such act or omission.

If plaintiff clothed Cutter & Co. with apparent title, or power to sell, or did anything out of the usual course of business calculated to and which did actually mislead the defendants in respect to the ownership or right of sale of the cotton, it would clearly be inequitable to permit the plaintiff to recover therefor from the defendants, who had parted with their money on the faith and credit of the appearances so created by him. The principle of estoppel would doubtless apply. (*McNeil* v. *Tenth National Bank*, 46 N. Y., 329.)

The question therefore arises did plaintiff so clothe Cutter & Co. with apparent title to or authority to dispose of the cotton in question. Defendants claim that by giving to them the delivery orders he conferred upon them indicia of title.

It seems scarcely necessary to discuss this proposition. The delivery orders were but the usual means adopted to put Cutter & Co. into temporary possession of the cotton to enable them to weigh, tag and cart it for shipment to the manufacturing companies they had falsely and fraudulently represented as purchasers. These orders worked no harm to any one. They were not seen by defendants or any person representing them, and their existence even was unknown to them. If the delivery orders were of such character as to indicate title in Cutter & Co., yet, as defendants were not misled by them, they furnish no support to their claim of estoppel. This is a familiar rule of law, and was so held in *Boyson* v. *Coles* (6 M. and S., 14), which is a case similar in principle to the one at bar. It was also held in that case that a delivery order is evidence of right of possession, and not of ownership. Says ABBOTT, J.: "Upon this point, all that appears to have been imparted to the defendant, as the act of the plaintiffs, was the transfer order to the dock company, upon which the transfer was made to him by Coles Brothers; but I consider the transfer order merely as affecting the possession; farther than that I cannot carry it; and possession alone is not a sufficient emblem of authority to entitle a factor to pledge so as to enable the pawnee to hold the goods against the real owner. In the present case, it does not appear that the defendant was misled by any act or document with which the plaintiffs were concerned, other than such as regarded possession, and therefore the jury were warranted in the conclusion which they came to on the second question." (*People* v. *Bank of North America*, 75 N. Y., 547.) The purpose of these orders was served when they were delivered to the warehousemen who had the cotton in store, and they obeyed them. They no more indicate title than a written direction to one's cobbler to deliver to his servant a pair of shoes, clothes the latter with apparent ownership and right of sale of them. (*McEwan* v. *Judd*, 2 H. of L. Cas., 309.)

Defendants also insist that plaintiff, by intrusting Cutter & Co. with the temporary possession of the cotton for shipment, vested them with indicia of title. It is true that possession is some evidence of ownership, but the rule is elementary that bare possession is not sufficient to enable one to convey title

to chattels. (*Ballard* v. *Burgett*, 40 N. Y., 314; *McNeil* v. *Tenth Nat. Bank, supra; F. and M. Bk.* v. *Atkinson*, 74 N. Y., 587; *F. and M. Bk.* v. *Logan*, id., 568; *Loomis* v. *People, supra ; McGoldrick* v. *Willits*, 52 N. Y., 612; *Saltus* v. *Everett*, 20 Wend., 267; *Lickbarrow* v. *Mason*, 2 T. R., 62; *Boyson* v. *Coles, supra.*) If it were otherwise, ordinary business affairs could not be conducted with safety. The demands of trade require almost innumerable agencies in the transportation of merchandise and necessitate their delivery to employes, agents, and even strangers, for that purpose.

The case of *Higgins* v. *Burton* (26 L. J. [N. S.], 342, Ex.), is identical in principle with the one at bar. Plaintiff there had dealings with one Fitzgibbon, a merchant at Cork, in whose employ one Dix had been, who was known to plaintiff as agent for Fitzgibbon. Dix was discharged by Fitzgibbon, and afterwards and before plaintiffs were informed of it proposed to purchase from them, in Fitzgibbons' name, some silks, which were delivered to him and by him sent to defendant, who was an auctioneer, by whom they were sold and the proceeds paid over to Dix. Afterwards Dix obtained other goods from plaintiff in a similar way, upon which defendants made advances in ignorance of the fraud. The plaintiff brought trover and recovered. WATSON, B., says : " Dix only affected to have the authority of Fitzgibbon to purchase the goods; he had in fact no such authority and no property passed to him. There was no real contract and he could give no better title than he had ; and the pledge to the defendant passed no property. The case of *Hardman* v. *Booth* (1 H. & C., 803; 7 L. T. Rep. [N. S.], 638; *Cundy* v. *Lindsay*, 38 id., 573; and *Barker et al.* v. *Dinsmore* (72 Penn., 427), are similar in their facts and to the same effect. *Babcock* v. *Lawson* (20 Alb. L. J., 407), cited and relied upon by defendant's counsel does not conflict with these authorities or the views here stated. That case has no similarity to this. The language of Chief Justice COCKBURN, in relation to possession as evidence of title, relates only to the possession of a factor or one otherwise held out as having power to sell. The distinction must be borne in mind between the case in hand and that of a person procuring *the sale* of goods by means of false prétences. Here

there was no sale ; there was no purchaser, and so the title remained in plaintiff. If one by fraudulent contrivances induce the sale and delivery of goods to himself, he could doubtless convey a good title to a *bona fide* purchaser of them for value so long as the original owner has not exercised his right to revoke the sale and reclaim his goods. The reason of this rule is obvious. The owner in the case supposed has clothed the fraudulent purchaser with a qualified title; as well as given him possession, and therefore it would be a rank injustice to permit him to take them from an innocent person who had in his purchase relied upon the evidences of title so created. · The principle of estoppel in such cases would prevail. This distinction is pointed out in *Cundy* v. *Lindsay* (*supra*), in which Lord Chancellor CAIRNES in his opinion says : " The result, therefore, is this, that your lordships have not here to deal with one of those cases in which there is *de facto* a contract made, which may afterwards be impeached and set aside on the ground of fraud, but you have to deal with a case which ranges itself under a completely different chapter of law : the case namely in which the contract never comes into existence. That being so, it is idle to talk of property passing." (*Zink* v. *The People, supra ; McGoldrick* v. *Willits,* 52 N. Y., 612; *Smith* v. *The People,* 53 id. 111.)

The rule of law applicable to the two classes of cases, and the distinction above referred to, are accurately and tersely stated in the head-note to the case of *Higgins* v. *Burton* (*supra*), as follows : " When the owner of goods suffers another to have possession of them, or of the documents which are the evidence of property therein, on a sale to him obtained by means of fraudulent representations, and avoidable at the option of the owner, a sale or pledge by such party before the owner has exercised his option and without notice to the subsequent purchaser is binding ; but this is not so when the party has merely obtained the goods by means of false pretences, without any contract of sale to himself, as when he falsely and fraudulently represents that another person has authorized him to purchase the goods; and in such case the original owner can recover the goods from a party to whom they have been sold or pledged by the person who fraudulently

obtained them before any notice of the fraud or any disaffirmance of the transaction by the real owner."

The only case that has been cited or which we have been able to find in conflict with these views is *Craig* v. *Marsh* (2 Daly, 61.) The learned judge who wrote the opinion seems to have been misled by the general language of the opinion of some of the cases of sales of goods by false pretences, and not to have kept in mind the distinction between this line of authorities and those in which there is *de facto* no contract of sale made, as stated by Lord Chancellor CAIRNES in *Cundy* v. *Lindsay* (*supra*), in commenting on this distinction. The opinion itself, and the cases cited and relied upon by the learned judge, indicate this mistake. The counsel for the plaintiffs in that case also seems to have fallen into the error of conceding that the person fraudulently procuring the goods was not guilty of larceny, and the concession doubtless misled the court. The case, so far as we are aware, has not been cited with approval or followed, and is not supported by any of the authorities referred to in the brief opinion of the court.

This brings us to a consideration of the effect of section 6, chapter 326 of the Laws of 1858, upon the rights of the parties. This act is entitled "An act to prevent the issue of false receipts, and to punish fraudulent transfers of property by warehousemen, wharfingers and others (3d Edm. Stat., p. 667).

The section in question reads as follows: "Warehouse receipts given for any goods * * stored or deposited with any warehouseman * * may be transferred by indorsement thereof, and any person to whom the same may be so transferred shall be deemed and taken to be the owner of the goods * * therein specified, so far as to give validity to any pledge, lien or transfer made or created by such person or persons." The learned counsel for the defendants insist, that the provisions of this section afford them a complete protection against a recovery in this action; that, having purchased the cotton upon the faith of the negotiable warehouse receipts, and paid therefor full market value, this case falls both within the spirit and the letter of the section. All the other sections of this act, except the last, which is unimportant, prohibit the issue of false receipts, etc., and prescribe the penalty for a

violation of their provisions. The scope and object of the act, therefore, seems to be to protect the mercantile community against fraudulent practices by warehousemen, wharfingers and others, in respect to these receipts for goods stored or represented to be stored with them. That this is the purpose is shown by the title of the act. The sixth section is simply an enunciation of common law principles. It estops the warehouseman from disputing the title of the innocent holder of a negotiable receipt issued by him, and renders him liable to account to such holder for the goods therein represented, whether falsely issued or not. The clause, "warehouse receipts given for any goods * * stored or deposited with any warehouseman," means receipts given for goods so stored or deposited by any person having the title thereto, real or apparent, or authority from such person therefor. This section of the act proceeds upon the assumption that the receipt is so issued. Any other construction would enable warehousemen to issue receipts for goods, known by them to be stolen, and so convey title to them, or even themselves to commit larceny, and by issuing receipts for the stolen property defraud the plundered owner of all title to and power of reclaiming it. Such a construction would work a change in the law hardly contemplated by the Legislature when the act under consideration was passed, and yet the construction insisted upon by the defendants would accomplish precisely this result. Courts often have to look beyond the mere words of a statute in determining its meaning, and give to it such an interpretation as the mischief sought to be cured and the evident intention of the Legislature indicate. Chapter 179 of the Laws of 1830, commonly called the Factor act, is entirely analogous, and has been construed by the Court of Appeals in conformity with the interpretation above given to the warehouse act. The factor act provides that "every person in whose name any merchandise shall be shipped shall be deemed the true owner thereof," etc. Now it is evident that a literal reading of this clause would give a thief who shipped stolen goods in his own name the same power to convey a good title to them, as the same character of construction would the warehouseman under the sixth section of the warehouse act, as above shown; but the Court of Appeals has held in *Kinsey* v. *Leggett* (71 N. Y.,

387), and other cases, that the act " only applies when the shipment is made with the consent of the real owner in the name of another ; " that " the act was not intended to deprive actual owners (of their property) who had not parted with their title, or who, by fraud and without any fault on their part, had lost control over it." (*Merch. and Trad. Bk.* v. *F. and M. Bk.*, 60 N. Y., 40; *Howland* v. *Woodruff*, id., 73; *First Nat. Bank of Toledo* v. *Shaw*, 61 id., 283; *Covell* v. *Hill*, 4 Denio, 323; *S. C.*, 2 Seld., 374; *F. and M. Bk.* v. *Logan*, 74 N. Y., 568.)

The precise question here presented was decided by the Commission of Appeals in the *First Nat. Bank of Toledo* v. *Shaw* (61 N. Y., 283). The plaintiff had discounted drafts drawn upon T. W. Griffin & Co., of New York city, upon the security of a bill of lading of a cargo of wheat, which stated that the wheat was shipped on account of plaintiff to Kidd, Pierce & Co., of New York, to be held by them until payment of the drafts, and then to be delivered to T. W. Griffin & Co., the wheat at Buffalo to be received and forwarded by A. L. Griffin & Co. to Kidd, Pierce & Co. A. L. Griffin & Co. transhipped by canal from Buffalo, and issued a canal bill of lading, in substance like the above, with the addition that the freight, etc., were to be paid to Young Bros., and sent this bill to T. W. Griffin & Co. or to Young Bros. On the arrival of the wheat at New York, it was unloaded by direction of T. W. Griffin & Co. at the warehouse of Shaw & Co., who issued to them a negotiable warehouse receipt therefor, according to their custom, which was to issue warehouse receipts to any one who sent boats to them without demanding to see the bill of lading.

T. W. Griffin & Co. indorsed and delivered the warehouse receipt to the New York Guaranty and Indemnity Company, and that company, upon the faith of it, made a loan of $14,000 to Griffin & Co. One of the drafts held by the bank was afterwards protested for non-payment, and it then brought an action against Shaw & Co. and the Guaranty and Indemnity Company to recover possession of the wheat; and the Commission of Appeals held that it was the duty of the warehousemen (Shaw & Co.) to have made inquiries as to the title of T. W. Griffin & Co., and inasmuch as the latter had no title or indicia of title save the

bare manual possession of the wheat, that the warehouse receipt afforded no protection to the Guaranty and Indemnity Company. Commissioner DWIGHT says, at page 297 of the reported case : "The warehousemen (Shaw & Co.) were bound to inquire whether a bill of lading accompanied the shipment. Their custom to make no inquiries, but to warehouse grain for any one who had the possession, could not in any respect prejudice the rights of the plaintiff. Having warehoused it, they were bound to hold the grain for the rightful owner Their receipt given for the grain was no protection to the Guaranty and Indemnity Company. Shaw & Co. simply trusted to a person having the naked possession, without any title or indicia of it. If on that bare possession they issued evidences of title, they were mere waste paper, under which the Guaranty Company can make no claim. A mere possessor cannot confer ownership by falsely asserting, through bills of lading or warehouse receipts, that he has a title." Again, at page 302, he says : " If the Guaranty Company saw fit to act on the so-called warehouse receipt, which itself had no solid foundation, it acted at its peril." And at page 303, etc., he says : " Shaw & Co. could not safely repose on the mere possession of Griffin & Co., but were bound to look into the shipping documents, and are accordingly chargeable with constructive notice of their contents. The Guaranty Company are in the same position with Shaw & Co. The warehouse receipt being mere waste paper, that company can claim no rights under it."

It is indisputable that the precise point in controversy in this action is here determined, and that it was directly involved in that case. If, then, Shaw & Co. had no right to issue a warehouse receipt for goods to one having control of the boat by and in which they were shipped, and then contained, and if a receipt so issued is worthless, and no protection to one acting and advancing on the faith of it, it is needless to argue that there is no justification for the warehouseman. Richards, in the case at bar, issuing receipts, as is shown by the testimony of the witness Kane, contrary to the usual course of business, to one having merely the naked manual possession of the goods for a temporary purpose, and where the shipping tags on the goods were in themselves sufficient evidence at least to put a prudent man on inquiry

as to the nature and purpose of such possession ; and if in the
*Toledo Bank Case* the warehouse receipts furnished no ground
for protection to the Guaranty Company, the receipts issued by
Richards surely cannot avail the defendants in this action.

In *Geneva National Bank* v. *Reamer* (7 Weekly Digest, 462),
the court, at Special Term, simply held that the question for
whom the grain covered by the receipt was received or held by
the warehouseman was one of fact, and should have been submit-
ted to the jury, and the learned justice in his opinion correctly
remarks : "A receipt fraudulently issued to one who has no prop-
erty held in store for him cannot bind or affect property held for
another." In *Yenni* v. *McNamee* (45 N. Y., 619), the receipt
given was held not to be a warehouse receipt under the meaning
of the statute. In *McCombie* v. *Spader* (1 Hun, 193), the goods
covered by the receipt were sold to the person putting them in
store, although the sale was fraudulently procured ; hence he was
in position before the goods were reclaimed by the original owner
to convey good title to them by sale directly to an innocent pur-
chaser, or through the medium of a warehouse receipt.

Plaintiff's demand of the defendants, before suit brought, was
sufficient. It is evident from the testimony that they knew to
what cotton he referred. The larceny and flight of Cutter & Co.
had become a matter of public comment, and the cotton in ques-
tion was called by them the Cutter cotton, and known to them
to have come through Cutter & Co., and the plaintiff, by his
demand, made orally and in writing on the 2nd of March, 1878,
specified the exact number of bales required, and so designated
them as connected with the fraud of Cutter & Co. as to have left
no doubt in the mind of the plaintiff as to the cotton called for.

The demand formerly made by plaintiff, January 11, 1878,
when he found a portion of the cotton in defendants' possession,
was also sufficient. If they had any misgivings at the time of
either demand as to the cotton referred to, it was their duty so to
inform plaintiff, and thus procure a more definite description of
it. Their failure so to do was a waiver of any defect there may
be in the demands in this respect. (*Marine Bank of Buffalo* v.
*Fiske*, 71 N. Y., 355.)

The demand and refusal to deliver the cotton, however, was

only evidence of conversion, and as it appeared upon the trial that the defendants had actually converted it by shipping it to Liverpool nearly two months before the commencement of the action, and there disposing of it, a demand was unnecessary. (*Marine Bank of Buffalo* v. *Fiske* [*supra*] ; *Pease* v. *Smith*, 61 N. Y., 477 ; *Connah* v. *Hale*, 23 Wend., 462.)

We have thus gone over, at considerable length, the various questions raised in this case and argued in the briefs of counsel with much force and skill, because of their great importance, and as to some of them, their novelty. All the parties to this action are innocent of fault in respect to the matters in controversy, and it is simply the duty of the court to see to it that the loss, which in any event must work a hardship, falls where the law casts it.

The judgment appealed from must be affirmed, with costs.

BARNARD, P. J., and GILBERT, J., concurred.

Judgment affirmed, with costs.