(110 App. Div. 636.)

SALEN et al. v. BANK OF STATE OF NEW YORK.

(Supreme Court, Appellate Division, First Department.   January 19, 1906.)

1. BILLS AND NOTES—CHECKS—PRIMA FACIE OWNERSHIP.

Checks made payable to one prima facie belong to him, and can only be transferred by him or his agent.

[Ed. Note.—For cases in point, see vol. 7, Cent. Dig. Bills and Notes, § 434.]

2. SAME—BONA FIDE PURCHASER—KNOWLEDGE OF UNAUTHORIZED INDORSE-MENT.

Where an agent, authorized to indorse the checks of customers payable to the principal and deposit them in a designated bank for collection, indorsed checks in his principal's name, and deposited them with a broker as margins in his speculative stock account, the broker was liable to the principal for the amount of the checks, because he had notice of the wrongful act of the agent.

[Ed. Note.—For cases in point, see vol. 7, Cent. Dig. Bills and Notes, §§ 842, 844.]

3. SAME—FORGED INDORSEMENT.

An agent, authorized to indorse checks of customers payable to the principal and deposit them in designated banks for collection, indorsed checks and deposited them with a broker as margins on a personal speculative stock account.   The broker deposited the checks in a bank, which received them and paid the proceeds thereof to him in good faith.   *Held*, that as the indorsements made by the agent were not forgeries, within Negotiable Instruments Law, Laws 1897, c. 612, § 42, providing that a forged signature is inoperative, and no right to the instrument can be acquired thereby, the bank was not liable to the principal as for a conversion of the checks.

Appeal from Trial Term, New York County.

Action by Paul Salen and another, composing the firm of Salen & Schroeder, against the Bank of the State of New York.   From an order denying a motion to set aside a verdict for plaintiff, and for a new trial on exceptions directed to be made in the first instance in the Appellate Division, defendant appeals.   Reversed.

Argued before O'BRIEN, P. J., and INGRAHAM, McLAUGHLIN, LAUGHLIN, and CLARKE, JJ.

Winthrop & Stimson (Lawrence E. Sexton, of counsel), for appellant.

Opdyke, Ladd & Bristow (Geo. A. Strong and Wm. S. Opdyke, of counsel), for respondents.

CLARKE, J.   This action was brought to recover about $6,000 damages for the conversion by the defendant of a number of checks, and of the proceeds thereof, belonging to plaintiffs.   Plaintiffs reside and do business in Paris, France, as general commission merchants.   In 1901, and for some time prior thereto, they had an agency in the city of New York, and one Martin Cassidy was their agent in charge, receiving and forwarding orders from their customers, and making sales and collections under written agreements defining his authority.   The agreement contained this clause:

"(6) The bank account of the said agency shall be kept with the Fifth Avenue Bank, unless otherwise arranged by said firm, and in the name of

Salen & Schroeder. The said Cassidy shall be authorized to endorse checks for deposit to the credit of the said account, and to draw checks as attorney for the said firm against the said account."

Plaintiffs executed and delivered a power of attorney to said Cassidy, "for us and in our names * * * to make, sign or draw checks on the Fifth Avenue Bank of New York, and to endorse notes, checks, drafts, and bills of exchange for deposit in said bank for collection or for credit." By a subsequent writing "it was agreed that Messrs. Schroeder, Cassidy and Ryan shall visit the Garfield Bank and endeavor to arrange a plan by which New York will have the power to secure accommodation when required, this account to require the signature of Messrs. Cassidy and Ryan"; and thereafter plaintiffs made and delivered another power of attorney to Martin Cassidy and Thomas Ryan "jointly to sign checks, notes, drafts, bills of exchange and other commercial papers, to deposit in or draw from the Garfield National Bank of the city of New York, and to perform such act jointly in my name or the name of Salen & Schroeder as my said attorneys deem advisable in any transactions had with or through the said Garfield National Bank." Cassidy received from plaintiffs' customers from time to time checks in payment of their accounts, made payable to Salen & Schroeder, among which were the checks mentioned in the complaint. These checks Cassidy indorsed in the firm name of the plaintiff, followed by his own name, and delivered them to the firm of E. H. Norton & Co., who indorsed and deposited them with the defendant for collection. Defendant collected the checks and paid over the proceeds to Norton & Co. Norton & Co. were bankers and brokers in the city of New York, and Cassidy had with them a speculative stock account, like any other "customer who speculated in securities." His margins in these speculations consisted of whatever credit balance there was in this account. There can be no doubt from the evidence that E. H. Norton & Co. knew that Cassidy was the agent of plaintiffs. Nor can there be the slightest doubt, irrespective of any knowledge of the limitation of the terms of the agreement of employment or the powers of attorney, that Norton & Co. had knowledge that Cassidy had no right to use the checks made payable to the order of the plaintiffs for his own speculative stock account. Being made payable to plaintiffs, prima facie they belonged to plaintiffs, and could only be transferred by proper indorsement by them or their duly authorized agent. It appears that the first of these checks came in indorsed only in the name of plaintiffs in the handwriting of Cassidy; which Norton & Co. knew; and that, some question being raised, he indorsed his own name under that of Salen & Schroeder. · It appears from the testimony of several of the clerks of Norton & Co. that these checks were the subject of question and doubt in that office. Norton & Co. were thus put upon their inquiry; first by the signature, second by their knowledge that Cassidy was an agent. It was their duty to inform themselves of the character of this agency, and its powers and limitations. It does not appear that they made any inquiries. It is claimed that, as Salen & Schroeder resided in Paris, it would have been useless to have inquired of the only person, Cassidy, who was available. But the cable extends under the Atlantic, and the post is reliable. An inquiry by either means

was possible.    But in any event, with or without inquiring as to the terms of his agency, it is quite obvious that when Cassidy took the checks of customers made payable to his employers, and deposited them as margins in his own speculative stock account in his personal broker's office, he was not proceeding within the actual or apparent scope of his employment, to the knowledge of those brokers.    We are satisfied that a recovery against them would be proper.

Is the bank which received these checks for collection from Norton & Co., and returned to them the proceeds thereof, likewise liable to the plaintiffs as for a conversion?    Plaintiffs' counsel states in his brief:

"The bare truth of the case is that the defendant bank has taken plaintiffs' checks on the faith of a forged indorsement, guarantied by Norton & Co., but that Norton & Co. took the checks with every reason to understand just what Cassidy was doing."

The learned trial court, in directing a vedict for the plaintiffs, said:

"The act of Cassidy in indorsing or signing the firm name upon the checks in question and turning the same over to E. H. Norton & Co., for the purpose of having the same applied to his own use and benefit, was ultra vires, and hence did not divest the plaintiffs' title thereto, nor was this title affected by the deposit of the checks by Norton & Co. with the defendant bank, although it received the same in good faith.    It results from these views that the signatures or indorsements of the plaintiffs' firm name upon the checks in suit were forgeries.    In this view, such indorsements or signatures under section 42 of the negotiable instruments law were wholly inoperative as against the plaintiffs."

Section 42, c. 612, p. 727, of the Laws of 1897 (the negotiable instruments law), is as follows:

"Where a signature is forged, or made without authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority."

It is clear from the record that Cassidy had the right to indorse the plaintiffs' name to checks for purposes of collection, and to deposit the same to the credit of plaintiffs in the Fifth Avenue National Bank.    It is equally clear that he had no such power to indorse their name and divert said checks to E. H. Norton & Co. for the purpose of carrying on therewith a speculative stock account.    Did the diversion, after indorsement, make the original indorsement a forgery?    Is the defendant, who, without knowledge of any of the facts known to Norton & Co., in good faith received the checks for collection, collected the sums due thereon, and paid said sums over to Norton & Co., liable as for a conversion?

We proceed to consider the cases cited and relied upon by the plaintiffs.    Schmidt v. Garfield Bank, 64 Hun, 298, 19 N. Y. Supp. 252, affirmed 138 N. Y. 631, 33 N. E. 1084.    In this case one Lingard was the bookkeeper of C. A. Schmidt.    There was testimony that Schmidt kept his account in the Chemical National Bank, and that he had a rubber stamp, "For deposit in the Chemical National Bank," and that Lingard had authority to use this stamp upon the back of checks, and to write plaintiff's name thereunder for the purpose of depositing the

same in the Chemical National Bank to the credit of the plaintiff. While Schmidt was away, Lingard indorsed a number of checks "C. A. Schmidt, George Lingard," and deposited them in the Garfield National Bank, the defendant. The defendant collected all such checks and placed the proceeds to the credit of Lingard, who subsequently drew out the same and appropriated them to his own use. The defendant claimed that Lingard's indorsement was not a forgery, and therefore it was not liable to plaintiff, because Lingard subsequently misapplied the proceeds. It was held that the authority to stamp, sign, and deposit to plaintiff's account in the Chemical did not give Lingard the slightest right to deposit to the credit of his own account in the Garfield, and that, "in receiving the checks and paying the proceeds thereof to Lingard, the officers of the bank acted at their peril. They knew that Lingard had indorsed the checks with the plaintiff's name; and, unless they were satisfied to take the risk of paying the proceeds to Lingard, they were bound to make inquiry as to the extent of his authority." That was a case, then, against the bank which dealt directly with the wrongdoer, the bank that collected the money, opened the account, and paid it over to him, and was bound to know the extent of his powers and authority. It was as if the plaintiff here had sued E. H. Norton & Co., and so is an authority only so far as we have held that such a suit would lie. Robinson v. Chemical Bank, 86 N. Y. 404. One Leonard was the clerk and agent for the collection of rents and for other matters of Beare. Leonard received a check for rent drawn on the Manhattan Company to the order of Beare. Leonard indorsed the check:

"Pay to the order of H. K. Leonard, Thomas M. Beare per H. R. Leonard, attorney for deposit, Chemical National Bank. H. K. Leonard."

He deposited the check in the Chemical Bank, which collected the amount thereof from the Manhattan Company, and placed it to the individual credit of Leonard, who subsequently checked out the same for his own use. The court said:

"The authority which Leonard had, as agent, to collect the rent and transact other business for Beare, gave him no legal authority to indorse this check, and his indorsement thereof was just as ineffectual to pass any title as if he had forged Beare's name. * * * That an action for conversion will lie in such a case has never been doubted."

Here, again, the action was against the bank which dealt with the wrongdoer. Citizens' National Bank v. Importers' & Traders' Bank, 119 N. Y. 195, 23 N. E. 540. The plaintiff, an Iowa bank, had funds on deposit with defendant sufficient to meet certain bills of exchange which it drew on defendant in favor and to the order of Wadsworth & Co. Wadsworth & Co. indorsed these drafts to certain creditors in payment of their accounts, and delivered them to their bookkeeper to be sent off. He erased the indorsements, forged others, and used the paper for his own purposes. It thereby came into other hands and through the Fourth National Bank was presented to and paid by the defendant. After the forgeries were discovered, and upon return to the plaintiffs of the drafts from the defendant, Wadsworth & Co. demanded and obtained them back from plaintiff and indorsed them to one W. for collection. He was refused payment of them by

the defendant on their presentation, on the ground of their previous payment. The plaintiff repaid to Wadsworth & Co. the moneys wherewith the drafts had been purchased by them, and then commenced this action. The court held that the cause of action was for the breach of the contract to pay the drafts of the plaintiff. "We must regard the paper as never having been paid by defendant to the order of the plaintiff; for the rule is well and long established that a forged indorsement does not pass a title to commercial paper, negotiable only by indorsement, and payment by the drawee, although in good faith, of a draft so affected, is no payment at all, as to the true owner. It was the defendant's business to see to it that its depositor's moneys were expended according to its directions, and every expenditure was at the defendant's risk of the direction being valid and of the indorsement conveying title to the holder being genuine. * * * Forgeries may consist, in the legal sense, of any fraudulent alterations of paper by which another may be defrauded. So we have no payment of these drafts proved, and the question becomes solely one upon its objection to the right of the plaintiff to maintain this action for nonpayment by the defendant to third persons of the drafts. * * * If this plaintiff was suing upon this paper through a derivative title from Wadsworth & Co., it would be a very different question indeed. But the payment back of the moneys to Wadsworth & Co. established the damage and extent to which the defendant's act subjected the plaintiff. * * * When the defendant paid the check upon the forged indorsement, it paid its own money and discharged no part of its indebtedness to the plaintiff." This, then, is simply a case of a depositor against his own bank, which has sufficient funds of his to meet the draft, for not paying his draft on it, because the bank has theretofore paid a forged draft and charged it against his account.

In People v. Bank of North America, 75 N. Y. 547, one Phelps was a clerk in the State Treasurer's office. Ten drafts payable to the order of the Treasurer had been delivered at his office. It was no part of Phelps' duty to indorse drafts. He had no authority to do so, express or implied. He did indorse eight of these drafts, and diverted them from their proper use. The defendant took these drafts with the forged indorsements from persons in the wrongful possession of them, collected the money upon them, and surrendered them up to the drawees. Judge Earl said "that, under such circumstances, it can be sued for a conversion of them is well settled in this state." Two other of the drafts were indorsed in blank by the deputy treasurer, who had authority to indorse them, and delivered to Phelps for deposit in one of the legally designated deposit banks in Albany. Phelps filled up the blanks in the indorsements with the name of Hudson, the cashier of a firm of private bankers in New York, and delivered the drafts to that firm, and from it the defendant took them. "The general principle that when an agent is intrusted with negotiable paper for a particular purpose, and fraudulently diverts it to another purpose, a person taking such paper or dealing in it in good faith will be protected, is not disputed by the plaintiffs. * * * To conclude the whole discussion, in the final analysis of this case, the claim of the defendant to the sight drafts may be answered by

the application of the elementary principle that one who takes property (not negotiable instruments) from or under a thief or other person who has wrongfully converted the same can have no better title than the wrongdoer had; and the claim of the plaintiffs to recover for the two drafts may be answered by the application of the principles which protect one who in good faith takes or deals in negotiable paper." It will be seen that the eight drafts were not considered negotiable instruments, because Phelps, who indorsed them, had no authority, express or implied, so to do, and therefore, never having been indorsed by the payee, they were not negotiable. But, as the other two drafts had been properly indorsed by the payee, the fact that Phelps wrote a fraudulent indorsement over the proper signature and diverted them to his own use did not destroy their character as negotiable paper. The title of an innocent holder was good, and an action for conversion would not lie.

Considering these authorities together, and applying them to the case at bar, I reach these conclusions: Cassidy was in lawful possession of the checks as the agent of the plaintiffs. He had a clear right to indorse them in the name of the plaintiffs. After he indorsed them he diverted them unlawfully to his own use by delivering them to E. H. Norton & Co., to be credited to his own speculative stock account. Norton & Co. are chargeable with responsibility for their participation in this wrongful act. Upon the evidence as it appears there is not a suggestion in the case that defendant had notice, knowledge, or suspicion tending to impeach the checks. Norton & Co. in the regular course of business transmitted the checks to defendant for collection, defendant collected the proceeds thereof, and long before any demand from plaintiff, and without notice, paid over said proceeds to Norton & Co. As to the defendant bank, these checks were negotiable instruments, having been received without notice, in good faith, and for value, the bank not owing any duty to the plaintiffs as depositors, not being in possession of the proceeds at the time of demand, and having had no dealings with Cassidy, the wrongdoer, this action for conversion will not lie. As said by Mr. Justice Hatch in Bank of America v. Waydell, 103 App. Div. 35, 92 N. Y. Supp. 666:

"Where there were general indorsements carrying perfect title, and no knowledge of the limited title of the person making the transfer was brought home to the party or bank receiving it, the transactions assumed the form of dealing with instruments payable upon presentation, without notice of any limitation or defect in the title. Under such circumstances the courts have supported these actions in favor of the party dealing upon the faith of the instrument mainly upon the ground that it was essential to protect such right in order to give stability to business methods as a necessary element of commercial law."

The exceptions to the direction of the verdict for the plaintiff, and to the refusal to direct one for the defendant, are sustained. The order denying the motion to set aside the verdict and for a new trial is reversed, and a new trial granted, with costs to the appellant to abide the event. All concur.